1   Joseph E. Clark (SBN 281021)
2   PROSKAUER ROSE LLP
    Eleven Times Square
3   New York, New York 10036
    (212) 969-3000
4   jclark@proskauer.com

5   *Attorney for Defendant SerpApi, LLC*

6   *Additional Counsel listed on Signature Page*

7                   **UNITED STATES DISTRICT COURT**
8                   **NORTHERN DISTRICT OF CALIFORNIA**

9
10  GOOGLE LLC,
                                              Case No. 25-cv-10826-YGR
11                                            Hon. Yvonne Gonzalez Rogers
                Plaintiff,
12
                        v.                    Time: May 19, 2026, at 2:00 P.M.
13                                            Court: Courtroom 1, 4th Floor
    SERPAPI, LLC,
14
                Defendant.
15

16

17                  **SERPAPI'S MOTION TO DISMISS**

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION

2    PLEASE TAKE NOTICE that a hearing on SerpApi, LLC's Motion to Dismiss will take

3    place on May 19, 2026, at 2:00 P.M.

4    The motion seeks dismissal for failure to state a claim under Rule 12(b)(6).

5

## STATEMENT OF ISSUES TO BE DECIDED

6    1.    Does Google lack statutory standing under the DMCA, 17 U.S.C. § 1203(a),

7    because it is not a copyright owner and claims injury only as a website operator or non-exclusive

8    licensee with mere rights to display certain copyrighted content?

9    2.    Does Google fail to state a claim for circumvention of a technological copyright

10    access control measure implemented "with the authority of the copyright owner" under 17 U.S.C.

11    § 1201(a)(3)(B), where no authority of the copyright owner has been alleged?

12    3.    Does Google fail to state a claim that it employed a "technological measure that

13    effectively controls access" to a copyrighted work under 17 U.S.C. § 1201(a)(3)(B), where it does

14    not allege that access is controlled except for the solitary moment it appears in a search result?

15    4.    Does Google fail to state a claim that it employed a measure that effectively

16    controls access to copyrighted content when its bot detection system indiscriminately bars access

17    to entire public websites, regardless of whether they contain copyrighted content?

18    5.    Does Google fail to state a claim for "circumvention" under 17 U.S.C.

19    § 1201(a)(3)(A) where it has not alleged unscrambling, decryption, impairment, removal,

20    deactivation, or other similar forms of hacking, but just mimicry of human-controlled browsers?

21    6.    Does Google fail to state a claim for trafficking in circumvention technology under

22    17 U.S.C. § 1201(a)(2) where it fails to allege (i) a violation under 17 U.S.C. § 1201(a)(1) for the

23    reasons above; (ii) the separate sale of circumvention technology, as opposed to the mere delivery

24    of successfully scraped public information; or (iii) the lack of any commercial purpose other than

25    copyright access circumvention, such as scraping non-copyrighted, publicly-available content?

26    7.    Does Google fail to allege an "injury" necessary to bring a claim under 17 U.S.C.

27    § 1203(a), where it has not plausibly alleged any injury to its own copyright interests?

28

1

## **<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL ALLEGATIONS .............................................................................. 3

III.    GOOGLE LACKS DMCA STANDING............................................................ 6

IV.     GOOGLE FAILS TO ALLEGE AN ACCESS CONTROL MEASURE
        IMPOSED "WITH THE AUTHORITY OF THE COPYRIGHT OWNER." ................. 11

V.      GOOGLE FAILS TO ALLEGE SEARCHGUARD IS AN EFFECTIVE
        COPYRIGHT CONTROL MEASURE................................................................ 12

        A.      SearchGuard is Not Effective Because It Does Not Protect Access to
                Copyright Owners' Content...............................................................13

        B.      SearchGuard Is Not a Copyright Access Control Measure Because Its
                Purpose and Effect is to Prevent Lawful Public Scraping. ...................17

        C.      Bot Detection Systems Do Not Effectively Control Access to Public
                Websites.........................................................................18

VI.     SERPAPI HAS NOT CIRCUMVENTED A COPYRIGHT ACCESS CONTROL........ 19

VII.    GOOGLE HAS NOT PLAUSIBLY ALLEGED TRAFFICKING IN
        CIRCUMVENTION TECHNOLOGY............................................................ 22

VIII.   GOOGLE HAS NOT ALLEGED A COGNIZABLE DMCA INJURY......................... 23

IX.     CONCLUSION........................................................................ 24

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

## TABLE OF AUTHORITIES[1]

2

**Page(s)**

3

CASES

4

*Associated Gen. Contractors of Cal., Inc. v. California State Council of*
    *Carpenters*,
5
    459 U.S. 519 (1983)..........................................................................6, 7, 10, 11

6

*Avaya, Inc. v. Telecom Labs, Inc.*,
7
    2012 WL 13035096 (D.N.J. 2012) ...............................................................11, 14

8

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................12
9

*Couponcabin LLC v. Savings.com, Inc.*,
10
    2016 WL 3181826 (N.D. Ind. 2016).........................................................12, 21

11

*Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*,
12
    965 F.3d 365 (5th Cir. 2020) ...................................................................15, 17

13

*Dish Network L.L.C. v. World Cable Inc.*,
    893 F. Supp. 2d 452 (E.D.N.Y. 2012) ................................................................22
14

*Echostar Satellite, L.L.C. v. Viewtech, Inc.*,
15
    543 F. Supp. 2d 1201 (S.D. Cal. 2008)..............................................................9

16

*Egilman v. Keller & Heckman, LLP*,
17
    401 F. Supp. 2d 105 (D.D.C. 2005) ................................................................22

18

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*,
    497 F. Supp. 2d 627 (E.D. Pa. 2007) ................................................................21
19

*hiQ Labs, Inc. v. LinkedIn Corp.*,
20
    31 F.4th 1180 (9th Cir. 2022) ...............................................................*passim*

21

*Holmes v. Sec. Inv. Prot. Corp.*,
22
    503 U.S. 258 (1992)......................................................................................7, 25

23

*I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*,
    307 F. Supp. 2d 521 (S.D.N.Y. 2004)..............................................................22
24

*In re OpenAI, Inc. Copyright Infringement Litig.*,
25
    2025 WL 3635559 (S.D.N.Y. 2025)..............................................................21

26

27
_____

[1] Unless otherwise specified, all emphasis added, initial capitalizations conformed without brackets, and internal citations and quotation marks are omitted.

28

*iSpot.tv, Inc. v. Teyfukova*,
    2023 WL 1967958 (C.D. Cal. 2023).............................................................21, 22

*Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*,
    2017 WL 696126 (S.D.N.Y. 2017)............................................................21, 22

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004)....................................................................................20

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) .........................................................12, 13, 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)..............................................................................1, 7, 8

*Mango v. BuzzFeed, Inc.*,
    970 F.3d 167 (2d Cir. 2020)..........................................................................8

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
    629 F.3d 928 (9th Cir. 2010) ................................................................*passim*

*Meta Platforms, Inc. v. Bright Data Ltd.*,
    2024 WL 251406 (N.D. Cal. 2024) ...........................................................17, 20

*Murphy v. Millennium Radio Grp. LLC*,
    650 F.3d 295 (3d Cir. 2011)..........................................................................8

*NRA Grp., LLC v. Durenleau*,
    154 F.4th 153 (3d Cir. 2025) .......................................................................20

*RealNetworks, Inc. v. Streambox, Inc.*,
    2000 WL 127311 (W.D. Wash. 2000) ...............................................................9

*Righthaven LLC v. Hoehn*,
    716 F.3d 1166 (9th Cir. 2013) .....................................................................10

*Sheldon v. Plot Com.*,
    2016 WL 5107072 (E.D.N.Y. 2016)..............................................................9, 10

*Squires v. Lancaster Cnty. Prison*,
    2025 WL 3298948 (E.D. Pa. 2025) ...................................................................9

*Sybersound Recs., Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008) .....................................................................10

*VidAngel LLC v. ClearPlay, Inc.*,
    703 F. Supp. 3d 1329 (D. Utah 2023) ................................................................9

*Viral DRM LLC v. Seven W. Media Ltd.*,
    768 F. Supp. 3d 1025 (N.D. Cal. 2025) .................................................................9

*X Corp. v. Bright Data Ltd.*,
    733 F. Supp. 3d 832 (N.D. Cal. 2024) .................................................................17

STATUTES

17 U.S.C. § 1201 ................................................................................................. *passim*

17 U.S.C. § 1203 ...............................................................................................3, 24

18 U.S.C. § 1030................................................................................................18

OTHER AUTHORITIES

House Judiciary Comm. Rep., H.R. Rep. 105-551 ............................................. *passim*

Senate Judiciary Comm. Rep., S. Rep. 105-190 ........................................8, 11

Theresa M. Troupson, *Yes, It's Illegal to Cheat a Paywall: Access Rights and the
    DMCA's Anticircumvention Provision*, 90 N.Y.U. L. Rev. 325 (2015) ..................14

1

## I.    INTRODUCTION

Google built its search engine monopoly on the backs of countless other internet users who posted the "world's information" to the billions of pages that make up the World Wide Web. Google did this by using swarms of bots to scrape the public internet. This mass scraping, Google says, serves a noble mission to make the information "universally accessible and useful." Now, Google seeks to prevent others from doing to it what it does to others. It asks the Court to weaponize the Digital Millennium Copyright Act – a criminal statute designed to halt hacking of encrypted software and scrambled DVDs – to stop SerpApi from accessing *public* websites. The Act was not designed for that, and Google's suit is forbidden by the statute's plain text.

*No Standing.*  Google's suit never gets out of the starting gate. The DMCA is a copyright protection statute, not a website control statute. Public website operators like Google do not fall within its ambit. Google does not hold a copyright in its search results. It displays *other people's* information—information they chose to make publicly available. Nothing in the Act suggests that a technology provider – like Google – that organizes public information and who has no copyright interest of its own falls within the Act's "zone of interests." *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Nor can Google manufacture standing just because it sometimes commingles a licensed thumbnail image alongside its search results. Non-exclusive licensees lack DMCA standing too.

*No Authorization.*  Even apart from standing, there is no statutory violation. The Act only protects access controls imposed "with the authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(B). Google has not alleged that any copyright owner authorized it to institute the anti-bot system it developed to protect its search monopoly. When a college student posts a comment on X, and Google scrapes and republishes it, the student certainly did not authorize Google's anti-bot technologies.

*No Effective Access Control.*  Even if Google had the requisite authorization, its claim fails because Google's anti-bot system, which it refers to as SearchGuard, is not an "effective" copyright access control measure. Google is not the original source of the information. Identical

content is available on all the sites Google scraped, crawled, and populated its search results with, free of Google's anti-bot system. To borrow the Ninth Circuit's analogy, Google tried to lock the back door, but it left the front door wide open. *See MDY Indus., LLC v. Blizzard Entm't Inc.*, 629 F.3d 928 (9th Cir. 2010). That is fatal.

Google's claim also fails because it did not design a copyright control measure at all; it developed a website control measure. Its purpose and effect are to protect Google's search monopoly. It is not about copyright. The measure operates at the domain level; it does not separate or segregate copyrighted content from the reams of non-copyrighted public data it displays. Treating such general-purpose anti-bot tools as if they were copyright control measures would convert the DMCA from a copyright protection statute into a weapon to strip Google's competitors of their lawful right to scrape the open web. This defies the Ninth Circuit's admonition to narrowly construe anti-circumvention statutes to avoid creating "information monopolies that would disserve the public interest." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022). There is no greater monopoly than Google. The DMCA does not cement its monopoly just because Google sprinkles a few licensed thumbnails within its search results. Throwing a protected pebble on a beach does not allow Google to claim dominion over shore and sea.

*No Circumvention.* When Google scrapes, it does not circumvent. Neither does SerpApi. The DMCA prevents hacking: the "electronic equivalent of breaking into a locked room." *See* House Judiciary Comm. Report, H.R. Rep. No. 105–551, pt. 1, at 17 (1998). But Google does not allege unscrambling or decryption of any work, or the impairment, deactivation, or removal of any access system. It only alleges that SerpApi "solved" JavaScript challenges or CAPTCHAs or otherwise mimicked a human-controlled browser in ways that "misled" Google into providing search results. But that is not the equivalent of breaking a lock or drilling through a wall to obtain a copy of a book. Mimicry is not a violation.

The Ninth Circuit's decision in *hiQ* controls. Finding no violation of the Computer Fraud and Abuse Act through circumvention of LinkedIn's anti-bot measures, the court held that, "with regard to websites made freely accessible on the Internet, the breaking and entering analogue

1    invoked so frequently during congressional consideration has no application, and the concept of

2    without authorization is inapt." *See hiQ*, 31 F.4th at 1198.  Because mimicking humans to defeat

3    anti-bot systems on websites "presumptively accessible to the general public" – requiring neither

4    login nor password – does not violate the CFAA's *broader* ban on **all** "unauthorized access," it

5    does not violate the DMCA's narrower restraint on circumvention of those *same* access controls.

6         *No Injury.*  Finally, even if Google could establish a violation, its claim still fails because

7    it has not suffered a cognizable injury that Congress cares about.  Injury is an indelible requirement

8    of a private right of action under 17 U.S.C. § 1203(a).  Google says it spent billions on its search

9    empire, but the Act does not protect that.  It then says it spent more dollars building its bot detection

10   system.  But Congress was no more concerned with technology vendors' costs than those incurred

11   by locksmiths whose locks secure libraries.  It was concerned with copyright, and the creativity of

12   creators.  Google neither owns the copyrights nor possesses any impaired interest in any copyright.

13        Google's Complaint must be dismissed.

14   **II.    FACTUAL ALLEGATIONS**

15        ***Google is the Largest Scraper on the Planet.***  Google has "invested billions of dollars" in

16   its "search engine service."  Cmplt. ¶ 7.  Its "longstanding corporate mission" is **not** to create and

17   display its own information, but to "organize the *world's* information and make it universally

18   accessible."  *Id*. ¶ 13.  To collect this information "from the vastness of the World Wide Web,"

19   Google "locates [public] websites or other information on the internet …, organizes [it], and

20   presents [the] information as Search results."  *Id*. ¶¶ 1, 13.

21        This information is all 100% public.  And Google does not claim ownership in any of it.

22   To the contrary, it describes it as "open source."  *Id*. ¶ 15.  The information it scrapes from public

23   websites is not protected by copyright access controls, and Google claims the right to freely publish

24   it without restriction.  *Id*. ¶ 13.  It claims this right without alleging that it directly communicated

25   with any of the content authors or copyright owners, or that they authorized or even knew about

26   Google's scraping.  The data is public and so, in its view, Google can do with it as it pleases.

27        After scraping this information, Google synthesizes and displays it in ways it "believes will

28

be most relevant" to users. *Id*. ¶ 7. In doing so, it sometimes provides a "snapshot of timely information" that it organizes into a sidebar box it calls a "Knowledge Panel." *Id*. ¶ 15. Google does not claim ownership in this either.

Google has a unique and profitable business model. It makes its search results freely available to every person on the planet. Google does not require a login, account, or password to access the information. All you need to do is type a query into google.com. Thousands, even tens of thousands, of search results will then be at your fingertips in seconds. Users can then view, copy, transmit to others, or otherwise use this information without any copyright access controls attached to that content.

Rather than charge users for this information, Google sells advertising to "offset [its] costs and generate revenue." *Id*. ¶ 26. But advertisers, Google says, are only interested in people. And so, unlike when humans view Google's search results, Google does not earn advertising revenues "when the queries are automated." *Id*. For this reason, Google does not want its Search results to be scraped." *Id*. ¶ 23.

***Google Develops SearchGuard.*** To minimize scraping of google.com, Google developed a bot detection system "known as SearchGuard." *Id*. ¶ 4. SearchGuard is a "technological measure" whose "purpose is to prevent unauthorized third parties from automatically accessing Google's Search results." *Id*. ¶¶ 4, 27.

Google does ***not*** allege that SearchGuard distinguishes between copyrighted and non-copyrighted information. It operates at the domain level. And it only denies access to a single website – google.com – if it believes a query might have a bot behind it. It is not content-specific. It operates the same way regardless of whether the search results contain copyrighted information or not. And, when the information appears or is taken off google.com – with or without authorization – SearchGuard has no further role to play and then no access control measure protects the content. So, for the milliseconds between submission of a query and the time a search result appears on a screen, SearchGuard may be active. But at all other times, on all other websites, and in all other places, the ***identical*** content is not access restricted.

Put simply, SearchGuard is ephemeral and of limited scope. It is not – and does not purport to be – a *copyright* access control measure. It is a *website* control measure.

**_SerpApi Does to Google What Google Does to Everyone Else._** Just like Google – but on a much smaller scale – SerpApi uses "automated means" to scrape public websites and collect data, which it then makes available to its customers in ways it believes they will find relevant and useful. *Id.* ¶ 19. This, of course, is exactly what Google does. *Compare id.* ¶ 13.

As Master of its Complaint, Google chose to largely omit the mechanics of how *it* appropriates information from other public websites. But it claims SerpApi has done wrong when it scrapes google.com by "circumventing" Google's anti-bot efforts. It first asserts that SerpApi disregarded Google's terms of use and its *voluntary* robots.txt instructions. *Id.* ¶¶ 26-32. But it does not bring a breach of contract claim, so that allegation is irrelevant.

Instead, it falls back on its SearchGuard bot detection system. But Google does not allege that SerpApi hacked google.com or SearchGuard. Nor does it allege SerpApi scrapes behind a login, that it unscrambled or decrypted any encryption, or that it removed, deactivated, or impaired the SearchGuard technology. Instead, it only alleges that SerpApi "solve[d] [a] SearchGuard[] challenge with a **_legitimate_** request and then syndicate[d]" it to other machines, or that it tricked Google into providing its search results by mimicking a human browser. *Id.* ¶ 32.

**_Google Tries to Convert the DMCA Into an Anti-Scraping Statute._** Google asserts that, by solving SearchGuard, SerpApi has "gain[ed] access to Google Search results" on "billions of separate occasions," but that it "does not compensate [Google] for the output or for the costs of responding" to these automated requests. *Id.* ¶¶ 19, 38. But Google recognizes that its infrastructure costs are irrelevant because the DMCA does not prevent scraping of public websites. It is not an anti-scraping statute. It is a *copyright* protection statute.

So even though it is seeking the complete cessation of SerpApi's access to google.com, Google tries to reframe its Complaint to zoom in on the limited "range of licensed copyrighted content in its search results." *Id.* ¶ 2. Of the billions of queries Google receives from users around the world, it will *sometimes* display a Knowledge Panel "alongside links to websites and other

1    information of potential interest."  *Id*. ¶ 15.  In a few (unspecified) instances, Google may

2    supplement this Knowledge Panel with "images" it licenses from copyright owners or other rights

3    holders.  *Id*. ¶ 16.  Google may also sometimes display licensed pictures of products or locations

4    when it provides shopping or mapping search results.  *Id*. ¶ 2.

5        But Google does not claim copyright ownership in these pictures.  Nor does it claim

6    exclusive rights.  It is a non-exclusive licensee with non-exclusive rights of display.  Google does

7    not even allege that its licenses provide it with any right to sublicense the photos or control their

8    use, distribution, or access further downstream.  Nor does Google allege that its license gives it

9    the power to exclude, as opposed to the rights to use and display.  Google also fails to allege – nor

10   could it – that the licensed content is subject to Google's SearchGuard measures when accessed

11   outside google.com.  And even for the seconds it does appear on google.com, Google has not

12   alleged that the copyright owner authorized any copyright access control measure.  Indeed, there

13   is no allegation that the copyright owner had any say or discretion over Google's use or application

14   of SearchGuard, or its decision to permit or prevent bot activity on google.com.  There is no

15   "copyright owner authorization" to be seen.

16       This motion follows.

17   **III.    GOOGLE LACKS DMCA STANDING.**

18       The DMCA confers standing only on those who suffer a cognizable DMCA injury.  Google

19   suffered none.  It is not a copyright owner.  It is a website operator and non-exclusive licensee of

20   images displayed alongside its search results.  Because the DMCA does not regulate web scraping,

21   and non-exclusive licensees fall outside the statute's zone of interests, Google's claim fails.

22       *Google Must Plead DMCA Standing.*  In *AGC*, the Supreme Court held that a statute's

23   private right of action extends only to injuries Congress sought to forestall.  *Associated Gen.*

24   *Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540 (1983).

25   Although a "literal reading" of statutes authorizing suit by "any person … injured" "is broad

26   enough to encompass every harm that can be attributed directly or indirectly to the consequences

27   of [the] violation," the Court rejected that approach.  *Id*. at 529.  Statutory standing, the Court said,

28

1    "cannot be answered simply by reference to [such] broad language." *Id.* at 535. Rather, it

2    "requires [courts] to evaluate the plaintiff's harm, the alleged wrongdoing …, and the relationship

3    between them." *Id.*

4         So was born the concept of antitrust standing. The Supreme Court later extended this

5    principle to RICO standing. *See Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 266 (1992) ("but

6    for causation" insufficient). And in 2014, the Supreme Court "made clear" that this limitation

7    "applies to ***all*** statutorily created causes of action; that it is a requirement of general application;

8    and … is presumed [to apply] unless it is expressly negated." *Lexmark Int'l, Inc. v. Static Control*

9    *Components, Inc.*, 572 U.S. 118, 129-32 (2014).

10        To have statutory standing under *Lexmark*, a plaintiff must show that its injuries "fall

11    within the zone of interests protected by the law invoked" and were "proximately caused" by the

12    defendant's conduct. *Id.* A causal injury-in-fact is not enough. To invoke the DMCA, the plaintiff

13    must allege injury to a *legal interest* Congress sought to protect. Google cannot.

14        ***The DMCA Is a Property-Protection Statute.*** Copyright is a quintessential form of

15    intellectual property, grounded in the Copyright Clause of the Constitution. Exercising that power,

16    Congress placed the DMCA in the Copyright Act to enhance those rights. It gives *copyright*

17    *owners* a new stick in the bundle of rights they traditionally enjoyed, allowing them to control

18    "access" to their content. *MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 946 (9th Cir.

19    2010) (noting that the DMCA "granted ***copyright owners*** a new weapon").

20        As the Ninth Circuit explained, "historically speaking, preventing access to a protected

21    work in itself has not been a right of a ***copyright owner*** arising from the Copyright Act." *Id.* at

22    944. But as technology evolved, it became increasingly easy for "users of electronic media to send

23    and retrieve perfect reproductions of copyrighted materials" once they had access. *See* House

24    Judiciary Comm. Rep., H.R. Rep. 105-551, at 9. Congress, therefore, decided "to provide effective

25    legal remedies against the circumvention of protective technological measures ***used by copyright***

26    ***owners***," and to "grant[] ***copyright owners*** the right to enforce that prohibition." *Blizzard*, 629

27    F.3d at 942, 944.

28

1    The statute's text confirms this.  It vests **all** decision-making authority in the copyright
2    owner.  Technological measures must be implemented "with the authority of the copyright owner"
3    and cannot be bypassed "without the authority of the copyright owner."  *See* 17 U.S.C.
4    § 1201(a)(3).  By doing so, the Act "grant[s] ***copyright owners*** a new anti-circumvention right"
5    under their control.  *Blizzard*, 629 F.3d at 945; *see also Mango v. BuzzFeed, Inc.*, 970 F.3d 167,
6    172 n.2 (2d Cir. 2020) (DMCA is designed to provide "protections to ***copyright owners***."); *Murphy*
7    *v. Millennium Radio Grp. LLC*, 650 F.3d 295, 303 (3d Cir. 2011) (same).

8    The legislative history is equally clear, and more colorful.  As the House Judiciary
9    Committee explained, "the act of circumventing a technological protection put in place by a
10   ***copyright owner*** to control access to a copyrighted work is the electronic equivalent of breaking
11   into a locked room in order to obtain a copy of a book."[2]  *See* H.R. Rep. No. 105-551, at 17.  And
12   the enabling treaties required signatory nations to "provide adequate legal protection and effective
13   legal remedies against the circumvention of effective measures ***that are used by authors*** in
14   connection with the exercise of ***their*** rights."  *Id.*; *see also* S. Rep. 105-190, at 27 (same).  The
15   Ninth Circuit "read[s] this legislative history as confirming Congress's intent … to grant ***copyright***
16   ***owners*** an independent right to enforce the prohibition against circumvention of effective …
17   access controls."  *Blizzard*, 629 F.3d at 947.  The legislative history says nothing about website
18   operators or non-exclusive licensees.

19   ***Under Lexmark, Only Copyright Owners Suffer a DMCA Injury.***  In *Lexmark,* the
20   Supreme Court provided an apt illustration of when an injury falls outside of a statute's zone of
21   interests.  "A consumer," it explained, "who is hoodwinked into purchasing a disappointing
22   product may well have an injury-in-fact" arising from a marketer's false advertising, "***but cannot***
23   ***invoke*** … the Lanham Act" because the Act was only designed to protect "commercial interests."
24   *Lexmark*, 572 U.S. at 132, 137.

---

[2] *See also* Senate Judiciary Comm. Rep., S. Rep. 105-190, at 15 (1998) ("The purpose of … section 1201 is to improve the ability of ***copyright owners*** to prevent the theft of their works, including by applying technological protection measures.").

1   The same logic applies here.  Applying *Lexmark*, courts have concluded that the DMCA's

2   anti-circumvention provisions do not extend to a plaintiff who "does not claim that it owns the

3   copyrighted material" and does not allege that the "copyright owner has authorized it to protect

4   the copyrighted material." *VidAngel LLC v. ClearPlay, Inc.*, 703 F. Supp. 3d 1329, 1335 (D. Utah

5   2023); *Squires v. Lancaster Cnty. Prison*, 2025 WL 3298948, *3 (E.D. Pa. 2025) ("In the DMCA

6   context, the zone of interests does not include a party who alleges injury but ***who has no legal***

7   ***interest*** whatsoever in any of the material"); *Sheldon v. Plot Com.*, 2016 WL 5107072, *10

8   (E.D.N.Y. 2016) (the DMCA created private rights of action only for "owners" of copyrights).[3]

9   Here, Google tries to extend DMCA standing beyond copyright owners by donning two

10  hats:  website operator and non-exclusive licensee.  Neither suffices.

11  ***Public Search Engines Lack DMCA Standing.***  Google does not argue that the DMCA

12  regulates access to public websites.  So, even if its servers are protected like Fort Knox,

13  circumvention of its anti-bot systems does not constitute a DMCA injury.

14  Google's fallback argument – that it fits within the DMCA's zone of interests because it

15  deploys its anti-bot system to protect the third-party content its servers host – fails for a simpler

16  reason:  technology providers do not hold legal or beneficial interests in property Congress sought

17  to protect.  Extending standing to website operators would be akin to permitting the locksmith or

18  home builder to sue just because a book happens to sit inside the house.  The statute protects the

19  book's author, not the architect.

20  The Act's rulemaking provisions underscore this point.  When crafting exemptions, the

21  Library of Congress must consider the "***market for or value of copyrighted works***."  17 U.S.C.

22  § 1201(a)(1)(C)(iv).  But Google's alleged injury as a search engine does not depend on the

23

24  _____

    [3] *VidAngel* cited several "non-binding" cases that found DMCA standing is not limited to copyright

25  owners, but most of them pre-date *Lexmark*, applied a literal approach that *Lexmark* expressly

    overruled, and did not address *Lexmark*'s "zone of interests" and "proximate cause" requirements.

26  *See, e.g.*, *Echostar Satellite, L.L.C. v. Viewtech, Inc.*, 543 F. Supp. 2d 1201 (S.D. Cal. 2008);

    *RealNetworks, Inc. v. Streambox, Inc.*, 2000 WL 127311, *6 (W.D. Wash. 2000).  While *Viral*

27  *DRM LLC v. Seven W. Media Ltd.*, 768 F. Supp. 3d 1025 (N.D. Cal. 2025), is more recent, it also

28  relied on pre-*Lexmark* caselaw and cases that did not address *Lexmark* standing.

1  "market for or value of" of copyrighted works that it scrapes from the public web.  And even if it

2  did, that injury would be derivative of the copyright owners'.  Because "the general tendency of

3  the law … is not to go beyond the first step," *see AGC*, 459 U.S. at 534, Google cannot sue for

4  that injury.

5         ***Google Lacks DMCA Standing as a Copyright Licensee.***  Google fares no better as a non-

6  exclusive licensee.  The Copyright Act distinguishes between copyright owners and non-exclusive

7  licensees, conferring standing only on the former.  *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d

8  1137, 1146 (9th Cir. 2008); *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169-70 (9th Cir. 2013)

9  (assignee with less than total exclusive rights lacks standing).

10        Congress's decision to place the DMCA within the Copyright Act – and the legislative

11  history that speaks only in terms of granting copyright owners the right to sue – indicates that

12  Congress intended to preserve that limitation.  *Sheldon*, 2016 WL 5107072, at *10 ("Both the

13  Copyright Act and the DMCA create private rights of action for owners of copyrights….

14  Accordingly, to bring a valid claim for copyright infringement under either statute, Sheldon must

15  demonstrate that he is ***the owner of the copyright interests*** in the Photograph"); *cf. AGC*, 459 U.S.

16  at 530 (limiting standing because the court cannot "ignore the larger context in which the entire

17  statute was debated.").

18        Nor would it make sense to give non-exclusive licensees standing.  The statute does not

19  give them any legal right to implement or waive access controls.  Only copyright owners possess

20  such rights.  17 U.S.C. § 1201(a)(3) (requiring "authority of the ***copyright owner***").  Expanding

21  standing to non-exclusive licensees would sever enforcement from the legal rights Congress vested

22  in copyright owners.

23        Limiting standing also avoids serious problems of proof.  If Google could sue, it would

24  need to haul each copyright owner into court to establish that they "authorized" Google's access

25  controls, and that they imposed similar technological measures when those *identical* works are

26  displayed by other non-exclusive licensees.  Without that, there would be no evidence that the

27  *work itself* – rather than just google.com – was protected by an effective *copyright* access control.

28

1   Finally, allowing Google to sue would invite duplicative recovery. Both the copyright

2   owner and Google could seek statutory damages for the *same* act and the *same* injury. The law –

3   and due process – does not permit that. *See AGC*, 459 U.S. at 543-44 ("Cases have stressed the

4   importance of avoiding … the risk of duplicative recoveries.").

5   **IV.    GOOGLE FAILS TO ALLEGE AN ACCESS CONTROL MEASURE IMPOSED
        "WITH THE AUTHORITY OF THE COPYRIGHT OWNER."**

6

7       The DMCA only protects access controls implemented "with the authority of the copyright

8   owner." 17 U.S.C. § 1201(a)(3)(B). As the House Judiciary Committee explained, that prohibition

9   only applies to a "work for which the copyright owner has put in place a technological measure

10  that effectively controls access to his or her work."[4] H.R. Rep. 105-551, at 17. Because Google

11  does not allege copyright-owner authorization, its claim fails. *See Avaya, Inc. v. Telecom Labs,*

12  *Inc.*, 2012 WL 13035096, *7 (D.N.J. 2012) ("Circumvention of a measure **put in place by a**

13  **copyright holder is necessary** … to give rise to a § 1201(a)(1) violation.").

14      This limitation is statutory and definitional. Congress expressly confined qualifying

15  measures in § 1201(a)(3) to those requiring "the application of information, or a process or a

16  treatment, **with the authority of the copyright owner**, to gain access to the work." 17 U.S.C.

17  § 1201(a)(3)(B). Likewise, there is no "circumvention" unless access occurs "**without the**

18  **authority of the copyright owner**." *Id.* § 1201(a)(3)(A). These definitions ensure that the

19  copyright owner – and no one else – controls access to protected works. *See H.R. Rep. 105-551,*

20  at 17 (the "relevant terminology" limiting the DMCA's scope to "**copyright owners**" is "defined

21  in paragraph (a)(3)); *see also* S. Rep. 105-190, at 28 (same, noting definitions limit measures to

22  those "**the copyright owner has put in place**.").

23      Because Google is not the copyright owner, its unilateral access control decisions are

24  irrelevant. It must allege that its SearchGuard technology was implemented with the "authority of

25  the copyright owner." It did not. Neither the word "authority" nor the phrase "copyright owner"

26

27  _____
    [4] *See also* S. Rep. 105-190, at 10 (noting that the enabling treaty calls for legal protections for
28  "technological measures … used by **copyright owners**.")

1    appears in the Complaint.  Indeed, when Google parroted the statutory definition of a qualified

2    technological measure, it intentionally **omitted** the words "with the authority of the copyright

3    owner," indicating that it could not plausibly allege such authority.  *See* Cmplt. ¶ 28.  A plaintiff

4    may not invoke a statutory definition while excising the limiting words it cannot satisfy.  *Bell*

5    *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 n.8 (2007) (*quoting AGC*, 459 U.S. at 526) ("It is

6    not … proper to assume that the plaintiff can prove facts that it has not alleged.").

7            This is no technical defect—it goes to the heart of why Google lacks a claim.  As a website

8    operator, Google's bots scour the public web, copying vast amounts of third-party content.  Google

9    does not allege it obtained advance authorization from any copyright owner to impose access

10   controls on their works.  Nor is it plausible that content creators – like people posting comments

11   on LinkedIn or Facebook – would authorize Google to restrict others, like SerpApi, from scraping

12   google.com.  When Google scrapes LinkedIn, it doesn't communicate with the post's creator.  So,

13   apart from Google's failure to allege that every search contains copyrighted material, its failure to

14   allege copyright owner authorization independently bars its claim that SerpApi "violated Section

15   1201(a)(1) …  each time SerpApi has circumvented SearchGuard."  *See* Cmplt. ¶ 39.

16           Google's narrower claim – that some search results contain "copyrighted works that third-

17   party rights holders have licensed to Google" – fares no better.  *Id.* ¶ 36.  The Act does not grant

18   non-exclusive licensees the power to authorize copyright access controls *of their own accord*.  Nor

19   does Google allege that any licensors – who themselves may not be copyright owners – granted

20   authority for Google to restrict access to their works.  SearchGuard is ***not*** a content-specific

21   measure tailored to licensed works.  It is a general-purpose anti-bot system regulating access to

22   google.com.  Google alone designs, deploys, and controls its application.  That unilateral control

23   is the antithesis of copyright owner authority.  The DMCA does not reach it.

24   **V.      GOOGLE FAILS TO ALLEGE SEARCHGUARD IS AN EFFECTIVE**
             **COPYRIGHT CONTROL MEASURE.**
25

26           SearchGuard is not a measure that "effectively controls access to a [protected] work."  17

27   U.S.C. § 1201(a).  No court has ever held that access to a public website like google.com violates

28   the DMCA.  This Court should not be the first.  *See Couponcabin LLC v. Savings.com, Inc.*, 2016

WL 3181826, *6 (N.D. Ind. 2016) (DMCA does not apply to websites "absent allegations that a user of plaintiff's website is required to apply … a password."); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 547 (6th Cir. 2004) ("Nor are we aware of any cases that have applied this provision of the DMCA to a situation where the access-control measure left the [copyrighted content] freely readable.").

### A.    *SearchGuard is Not Effective Because It Does Not Protect Access to Copyright Owners' Content.*

SearchGuard may regulate traffic on Google's website, but it does not regulate access to the content itself.  Even if SearchGuard rejects a particular query, at all other times and in all other places, the *same* content is publicly available.  No access barrier must be overcome, and no person must encounter or circumvent SearchGuard to access the work.  That precludes any finding that the work is protected by an "effective" access control measure.

Consider a simple example.  The New York Times publishes a photo on the front page.  It delivers stacks of papers to newsstands, places them on subscribers' doorsteps, and posts the image on NYT.com, accessible both with and without an account.  The Copyright Act protects the image against infringement (subject to the usual defenses, such as fair use) and the CFAA protects the *website* for the portion behind a login, but the widely distributed photograph is not subject to an effective access control.  When Google later scrapes – or even licenses – that image, Google does not suddenly gain DMCA protection or dominion over it.

Under the DMCA, a measure "effectively controls access" to copyrighted material only if "the measure … *requires* the application of information, or a process or a treatment, to gain access to the work."  17 U.S.C. § 1201(a)(3)(B).  The "requires … to gain access" requirement is not satisfied where the same work is publicly available without encountering any technological barrier.

Ephemeral controls that only protect access at isolated moments in time – leaving the work otherwise unprotected – are not "effective" because access does not "require" passing through the measure.  As the Sixth Circuit explained, "just as one would not say that a lock on the back door of a house controls access to a house whose front door does not contain a lock, … it does not make

1    sense to say that … the DMCA applies to otherwise readily-accessible copyrighted works."

2    *Lexmark*, 387 F.3d at 547.  For that reason,

3        "***The DMCA … does not naturally extend to a technological measure that***
4        ***restricts one form of access but leaves another route wide open***."  *Id.*

5    Put simply, an effective control must be always on.  *See also* Theresa M. Troupson, *Yes, It's Illegal*

6    *to Cheat a Paywall: Access Rights and the DMCA's Anticircumvention Provision*, 90 N.Y.U. L.

7    Rev. 325, 339 (2015) (citing *Lexmark*, "a technological protection measure must serve as a

8    gatekeeper for ***all access***.").

9        In *Blizzard*, the Ninth Circuit embraced *Lexmark's* "always on" requirement to bar claims

10   even when the measure was turned on and circumvented.  There, Blizzard made its *World of*

11   *Warcraft* game available both locally and online, protecting only the latter with its anti-bot

12   technology.  It sued the defendant for circumventing the technology.  Invoking *Lexmark's* front

13   door/back door analogy, the Ninth Circuit rejected the claim as to common elements accessible

14   both on- and off-line.  As the court explained, although the technology "blocks one form of access

15   … while connected to a [Blizzard] server," it was not an "effective access control measure"

16   because it "leaves open the ability to access these elements directly via the user's computer" once

17   the game had been downloaded.[5]  *Blizzard,* 629 F.3d at 952-53.

18       *Blizzard* and *Lexmark* control.  SearchGuard is ephemeral, applying only during the brief

19   moments a user interacts with google.com.  That renders it ineffective for both the public

20   information Google scrapes and the images it licenses.

21       *SearchGuard Does Not Control Access to the Content Google Scrapes*.  Google is a public

22   search engine designed to "organize the world's information."  Cmplt. ¶ 13.  It does not create the

23   content it displays; it copies and pastes it.  Google does not dispute that ***all*** this non-licensed

24   material – on billions of public webpages – is available elsewhere on the Internet without any

25   access control measure.

26

27   _____

     [5] *See also Avaya*, 2012 WL 13035096, at *8 (invoking the front door/back door analogy in rejecting
28   DCMA claim where the measure did not prevent "***all forms of access to the protected work***.").

1     Because Google does not allege that a person must satisfy a SearchGuard "challenge" to

2   gain access to the underlying work itself, its DMCA claim fails.  The Fifth Circuit's decision in

3   *Digital Drilling Data Sys., L.L.C. v. Petrolink Servs., Inc.*, 965 F.3d 365, 376-77 (5th Cir. 2020),

4   is instructive.  There, the plaintiff's database could be accessed either through a USB dongle (the

5   alleged control measure) or through third-party programs using default credentials.  Rejecting the

6   DMCA claim, the court held that the USB dongle "did not effectively control access … because

7   access to the database itself was available via third party programs *without ever encountering those*

8   *measures*."  *Id*.  Just as in *Digital Drilling*, Google may have slapped a lock on the back door, but

9   the copyright owner left the front door completely ajar.

10     ***SearchGuard Does Not Effectively Control Access to Licensed Content.***  The same

11   analysis applies to the limited content Google licenses.  Google has only non-exclusive rights of

12   display, meaning others – including the copyright owners and other licensees – retain control over

13   its distribution without any input from Google.  As with scraped content, Google does not allege

14   that SearchGuard, or any other technological measure, protects the content outside of google.com.

15   This omission defeats any claim that the work is subject to an "effective" access control.

16     Moreover, Google itself makes its search results publicly available, and takes no steps to

17   ensure that downstream recipients will restrict further access.  This is fatal.  As in *Blizzard*, once

18   users access and download the information, it is no longer protected by any access control measure.

19   From that point forward, it is freely accessible, copyable, and redistributable without encountering

20   any access control measure, and without having ever circumvented Google's SearchGuard in the

21   first place.  Because Google decided to make its search results public, it cannot establish that its

22   moment-in-time SearchGuard is an "effective" access control.

23

24

25

26

27

28

1    The Complaint proves the point.  Google took a screenshot of a "Knowledge Panel" of

2    Willie Mays.  It shows four *unlicensed* images of the baseball great, and its search results contain

3    one more unlicensed thumbnail scraped from Wikipedia.  According to the Complaint, it also

4    contains a *single* licensed image, similar to the unlicensed images.  And now, the entire Knowledge

5    Panel – including the solitary licensed image – can be freely copied and pasted into any email,

6    document, or website by anyone, anytime, for any reason without running into any access control.

7    Indeed, here it is, directly from the Complaint:



This image was obtained without accessing google.com, encountering SearchGuard, violating

Google's Terms of Use, or even being in privity with Google.

As this shows, Google's SearchGuard is an ephemeral *website* control measure, not a

*copyright* access control measure.  The two are not the same.  Effective access controls – like those

protecting DVDs, apps, and streaming services – are different.  Those digital rights management

systems require authentication each time a work is accessed, and the access control travels with

the content regardless of how many times it is accessed, copied, or transferred.  Not so for

SearchGuard, where the information, once displayed, is publicly available without restriction.

If the term "effective" control means anything, it means the information cannot be publicly accessible on a public website just by typing a search into a search bar.

### B.    *SearchGuard Is Not a Copyright Access Control Measure Because Its Purpose and Effect is to Prevent Lawful Public Scraping.*

SearchGuard is not an effective access control measure because it was designed to protect Google's search engine monopoly, not any licensed content. *Digital Drilling*, 965 F.3d at 376-77 (no DMCA claim where the measure limited users "ability to make use" of the plaintiff's software but was "not *designed* to control access to the [copyrighted] database" itself).

The name itself – "***Search*Guard**," not "CopyrightGuard" – says it all.  As Google admits, SearchGuard's "purpose is to prevent unauthorized third parties from automatically accessing Google's Search Results" because Google does not "generate [advertising] revenue … when the queries are automated."  Cmplt. ¶¶ 26, 27.  That has **nothing** to do with controlling access to copyrighted works, and everything to do with protecting Google's business model by regulating how visitors interact with google.com.  The DMCA does not govern that.

Congress did not enact the DMCA to protect Google's search monopoly or to prevent scraping of public websites.  In *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1202 (9th Cir. 2022), the Ninth Circuit cautioned against using access statutes to police *public* scraping because it would give platforms dominion over information they do not own.  As the Court explained,

> "Giving [platforms] free rein to decide, on any basis, who can collect and use data – data that the companies do not own, that they otherwise make publicly available to viewers, and that the companies themselves collect and use – risks the possible creation of **information monopolie**s that would disserve the public interest."  *Id*.

These concerns over crafting legal rules that may endanger a free and open web have led courts in this district to reject internet platforms' attempts to conscript unrelated laws to bar public web scraping.  *See X Corp. v. Bright Data Ltd.*, 733 F. Supp. 3d 832, 843 (N.D. Cal. 2024) (Alsup, J.) (finding **all** state law claims against scraping pre-empted by the Copyright Act absent a showing of actual server harm, akin to "denial-of-service attacks."); *Meta Platforms, Inc. v. Bright Data Ltd.*, 2024 WL 251406, *17 (N.D. Cal. 2024) (Chen, J.) (rejecting claims for logged-off search).

These concerns apply with even greater force to the DMCA.  Like the CFAA, which

broadly regulates access to any computer system "without authorization," the DMCA is narrowly confined to reach *only* copyrighted works.  *See* 17 U.S.C. § 1201(a); 18 U.S.C. § 1030(a)(2).  Construing the DMCA to prohibit *public website* access merely because a copyrighted thumbnail may appear on the screen stretches the statute far beyond its purpose and plain meaning.

The statutory text confirms this limitation.  A technological measure "effectively controls access to a work" only if it is directed at controlling access "to a work protected under" the Copyright Act.  17 U.S.C. §§ 1201(a)(1), (3).  A measure that indiscriminately blocks access to *everything* is not an effective *copyright* access control.

The legislative history underscores this point.  Congress enacted the DMCA to prohibit "the electronic equivalent of breaking into a locked *room* in order to obtain a copy of a book."  *See Blizzard*, 629 F.3d at 947 (*quoting* H.R. Rep. No. 105–551, pt. 1, at 17 (1998)).  But that analogy presumes that the lock is placed to protect the book.  A lock on a library door may qualify, but a lock on a private home does not, even if a dime store novel happens to sit on the sofa.

Google did not lock the library or close the front door.  SearchGuard is like fencing off a *public* beach.  Google may have placed a towel (a licensed image) near the shore, but it does not own the coastline.  Its general-purpose anti-bot technology does not segregate the copyrighted from the uncopyrighted.  It indiscriminately blocks automated access to google.com, whether its servers host one copyrighted article, a million, or none at all.  Giving its anti-bot system the force of law backed by trillions in statutory damages – more than the entire U.S. GDP – would effectively strip SerpApi of its right to search the public web.[6]  Congress did not intend that.  *See hiQ*, 31 F.4th at 1201 (finding relevant that the scraped data "is not owned by LinkedIn and has not been demarcated by LinkedIn as private using such an authorization system").

### C.    Bot Detection Systems Do Not Effectively Control Access to Public Websites.

SearchGuard is a bot detection system; it is not a "technological measure [that] effectively

---

[6] Because Google does not bring a claim for public web scraping, the Court must assume for purposes of this motion that SerpApi has a *legal right* to scrape non-copyrighted content on google.com and to "circumvent" any anti-bot technology designed to interfere with such scraping.

controls access to a work." 17 U.S.C. § 1201(a)(3)(B).  Detection systems that eject selected users from a public website are different from "access control" systems governed by the Act.  The statute defines an effective access control as one that "requires the application of information … to gain access."  *Id*.  A qualifying measure, thus, functions as a gate that "requires use of a key provided by a copyright owner."  H.R. Rep. 105-551, at 39.  A bot detection system does not ***provide*** a key to the user; it only expels unwanted visitors from the room.

In *hiQ*, the Ninth Circuit drew exactly this distinction between granting access in the first place and ejecting unwanted users.  There, LinkedIn argued that anti-bot policies – and its bot detection system – sufficed to establish that scraper's access to its public web pages was "without authorization."  The court, however, rejected that argument.  As the Court explained,

> "Where the default is free access without authorization, in ordinary parlance one would characterize selective denial of access ***as a ban, not as a lack of authorization.***"

*hiQ*, 31 F.4th at 1195-96.  As such, "where access [to a website] is open to the general public, the [access] without authorization concept is inapplicable" and "a user's accessing that ***publicly available data will not constitute access without authorization***" even where the user circumvents the website operator's anti-bot policies and technological measures.  *Id*.

The ruling applies with equal force here.  Google's SearchGuard is indistinguishable from LinkedIn's bot detection system.  Google's website is "presumptively public" just like the public portions of LinkedIn.  Nor does Google allege that users must register, enter usernames and passwords, or obtain encryption keys, license tokens, or encounter other forms of authentication to search google.com.  If LinkedIn's anti-bot system did not render a scraper's access "unauthorized," then it cannot be deemed to "effectively" control such access either.  And since the same technology governs both entry to the website and access to the copyrighted material on it, the latter is no more protected by an effective access control system than the former.  As such, under *hiQ*, bot detection systems for *public websites* do not qualify for DMCA protection.

## VI.     SERPAPI HAS NOT CIRCUMVENTED A COPYRIGHT ACCESS CONTROL.

Even if SearchGuard was an effective copyright access control measure, SerpApi has not

1    circumvented it.  The DMCA defines "circumvention" narrowly: "to descramble a scrambled

2    work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair

3    a technological measure."  17 U.S.C. § 1201(a)(3)(A).  Google does not allege this.

4          The Ninth Circuit's *hiQ* decision also sets the standard for establishing circumvention

5    "without authorization" under access control statutes.  As the court explained, the rule of lenity

6    requires that such statutes be narrowly construed because – like here – the statutory prohibitions

7    can be enforced both criminally and civilly.[7]  *hiQ*, 31 F.4th at 1200.  As such, if there is any

8    ambiguity in the definition of "circumvention," it must be given its narrowest reasonable reading,

9    not its broadest.  This is especially true given the "policy concerns" and "First Amendment interest

10   in maintaining accessibility of the Internet as an open forum."  *Cf. Meta*, 2024 WL 251406, at *18

11   (adopting narrow reading of anti-bot policies).

12         As in *hiQ*, Google alleges only that SerpApi's technology mimics a human-controlled

13   browser.  Cmplt. ¶¶ 23, 31-32.  But mimicking a human is not "descrambling" a scrambled work

14   or "decrypting" an encrypted work.  Nor does Google allege that such mimicry "deactivated,"

15   "impaired," or "removed" any technological measure.  SearchGuard may not be able to distinguish

16   between the two.  That does not mean that it was deactivated, impaired, or removed.

17         Nor does Google allege that SerpApi bypassed or avoided SearchGuard.  The terms

18   "bypass" and "avoid" are not defined by statute.  As such, under the rule of lenity, they must be

19   given their narrowest reasonable reading.  Here, Google only alleges that SerpApi "solved" a

20   SearchGuard challenge—that its mimicry was successful.  Cmplt. ¶ 32.  Knocking on the door and

21   being let in – even if one is wearing a mask – is not the same as drilling a hole in the wall and

22   climbing through.  *See* H.R. Rep. No. 105-551, at 17 (circumvention is the "equivalent of breaking

23   [in].");  *hiQ*, 31 F.4th at 1198 ("With regard to websites made freely accessible on the Internet, the

24   'breaking and entering' analogue invoked so frequently during congressional consideration has no

25

26   ---
     [7] *See also Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("Rule of lenity applies" regardless of
     whether we encounter its application in a criminal or noncriminal context."); *NRA Grp., LLC v.*
27   *Durenleau*, 154 F.4th 153, 166 (3d Cir. 2025) (applying rule of lenity because "dramatic changes
     in technology have swept virtually all internet-connected devices within the statute's reach.").
28

1    application, and the concept of without authorization is inapt.").

2         Google alleges no lock-picking or wall-breaking.  Instead, it identifies several ways Google

3    granted access to SerpApi even though "Google does not *want* its Search results to be scraped."

4    Cmplt. ¶ 23.  Its desire, however, is irrelevant because none of the acts constitutes circumvention.

5         *First*, Google says SerpApi disregarded Google's "Terms of Service," which "forbid[] the

6    use of automated means to access content … in violation of [its] machine-readable instructions,"

7    including "robots.txt."  Cmplt. ¶ 26.  This is no different than disregarding a sign to "stay off the

8    grass."  It is not circumvention of a *technological measure*.  *See OpenAI, Inc. Copyright*

9    *Infringement Litig.*, 2025 WL 3635559, *4 (S.D.N.Y. 2025) (robots.txt does not "effectively

10   control[] access."); *Joint Stock Co. Channel One Russia Worldwide v. Infomir LLC*, 2017 WL

11   696126, *18 (S.D.N.Y. 2017) ("violating contractual restrictions" is not "circumvention");

12   *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 643 (E.D.

13   Pa. 2007) ("No court has found" robots.txt "analogous to digital password protection.").

14        *Second*, Google alleges that SerpApi sends parallel requests through multiple IP addresses

15   to avoid Google's rate limits.  But rate limits are not an "effective" control measure, and using

16   multiple IP addresses is not circumvention.  *See Couponcabin LLC v. Savings.com, Inc.*, 2016 WL

17   3181826, *1, 6 (N.D. Ind. 2016) (no circumvention where defendants "continued their scraping

18   activity … using a variety of [*other*, non-blocked] servers" after plaintiff blocked "all traffic …

19   emanating from certain cloud computing providers" they previously used).  Here, Google does not

20   allege that SerpApi disabled any rate limiters; it only alleges compliance with them.  Google is

21   free to force users through a single gate where it can count queries – by requiring a sign-in, for

22   example – but it cannot use the law to restrict **more** than it has **chosen** to restrict technologically.

23        *Third*, Google alleges SerpApi solved JavaScript challenges with a "legitimate request"

24   and then "syndicate[d] the resulting authorization" to other machines.  Cmplt. ¶ 32.  That too is

25   not "circumvention."  Solving a challenge satisfies it; it does not bypass it.  When SerpApi solves

26   a challenge, it **receives** the key (assuming a "key" is even provided), and when it (allegedly)

27   syndicates it, it uses the key.  Neither is bypassing or avoiding the key requirement, and neither is

28

1    circumvention. *See iSpot.tv, Inc. v. Teyfukova*, 2023 WL 1967958, *12 (C.D. Cal. 2023) (use of

2    "a username and password" long after authorization to use lapsed not circumvention); *I.M.S.*

3    *Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521, 531–33 (S.D.N.Y. 2004)

4    (no circumvention arising from unauthorized use of "an otherwise legitimate, owner-issued

5    password"); *Egilman v. Keller & Heckman, LLP*, 401 F. Supp. 2d 105, 114 (D.D.C. 2005) (same);

6    *Joint Stock*, 2017 WL 696126, at *18 (same).

7        *Finally*, Google alleges that SerpApi "misrepresent[ed] the device, software, or location

8    from which the query is sent." Cmplt. ¶ 32. But the DMCA is not a fraud statute, and "using

9    deception to gain access to copyrighted material is not the type of circumvention that Congress

10    intended to combat in passing the DMCA." *Dish Network L.L.C. v. World Cable Inc.*, 893 F.

11    Supp. 2d 452, 464 (E.D.N.Y. 2012). And, even if it were, mere mimicry of a human browser –

12    the equivalent of wearing a mask when knocking at the door – is not enough. If it were, anyone

13    who lies about their name, location, or age at sign-in would violate the DMCA. Clearly, Congress

14    intended no such sweeping liability. The statute requires *bypassing* the "key" requirement entirely,

15    not obtaining the key under false pretenses. In any event, Google's allegations of

16    misrepresentation are conclusory, amounting to no more than a legal label. It does not satisfy the

17    heightened pleading requirements for deceptive acts under Fed. Rule Civ. P. 9(b).

18    **VII.    GOOGLE HAS NOT PLAUSIBLY ALLEGED TRAFFICKING IN**
19    **CIRCUMVENTION TECHNOLOGY.**

20        Google's trafficking claim under § 1201(a)(2) fails for the same reasons its § 1201(a)(1)

21    claim fails. If SerpApi's own use of its tools is not circumvention, then making those tools

22    available to others does not constitute trafficking in prohibited technology. But aside from the

23    absence of a predicate violation, Google fails to allege trafficking for three additional reasons.

24        *First*, Google does not allege the sale of circumvention *technology*. It only alleges that

25    SerpApi ***itself*** scrapes Google and then delivers the *content* to its customers. Content delivery is

26    not the same as trafficking in alleged circumvention technology, even if SerpApi allegedly uses

27    the technology to obtain the content and advertises its technological prowess in doing so.

28        *Second*, SerpApi's service is not "primarily designed or produced for the purpose of

1 circumventing a technological measure." 17 U.S.C. § 1201(a)(2)(A). Google's own allegations

2 foreclose the claim. It concedes that the vast majority of its information – the "world's

3 information," to use its words, *see* Cmplt. ¶ 13 – is not licensed or even copyrightable. Because

4 accessing this information is not actionable – and SerpApi's service can be used to access it –

5 SerpApi's service is not "primarily designed" to evade *copyright* access controls.

6       *Third*, for the same reason, Google has not plausibly alleged that SerpApi's service has

7 "only limited commercially significant purpose or use other than" copyright control

8 circumvention. *See* 17 U.S.C. § 1201(a)(2)(B). Because licensed content is only a small part of

9 the "world's information" that Google displays, SerpApi's service has tremendous value apart

10 from accessing the licensed thumbnails in Google's Knowledge Panel or other search results.

11 **VIII.  GOOGLE HAS NOT ALLEGED A COGNIZABLE DMCA INJURY.**

12       Google's claims also fail because it has not alleged a cognizable DMCA injury. The

13 DMCA permits only a "person injured by a violation" to "bring a civil action." *See* 17 U.S.C.

14 § 1203(a); *see also* H.R. Rep. 105-551, at 22 ("Section 1203 … **limits standing** to bring a civil

15 action to those persons **injured** by a violation of section 1201"). Thus, a plaintiff has to plead not

16 only a statutory violation of § 1201(a), but **actual** injury, too.[8] Google has not done so.

17       Google claims it is "harm[ed] through the direct imposition of costs to respond to

18 SerpApi's billions of automated queries." Cmplt. ¶ 40. But that alleged injury does not flow from

19 any statutory violation. Google's operational costs are not injury to a copyright interest. The

20 DMCA does not protect Google from unwanted search requests, nor is it concerned with server

21 costs. Its sole concern is protection of copyright. Google's infrastructure expenses are the same

22 whether it licenses one Willie Mays image or if every search result contains a licensed thumbnail.

23       For the same reason, the money Google spent to "develop and enhance [its] technological

24 measures" is not a cognizable injury. Cmplt. ¶ 40. The DMCA does not compensate technology

25

26 ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27 [8] Nor does the availability of "statutory damages" under § 1203(c) negate Google's obligation under § 1203(a) to allege a cognizable injury to have standing. Statutory damages only address the quantum of recovery, not the right to bring a cause of action in the first place.

28

1  providers for the cost of creating access controls.  Those expenditures may be a prerequisite to

2  invoking statutory protection, but they are not injury arising from circumvention.  Where

3  circumvention is the statutory wrong, recoverable damages must flow from the violation, not from

4  the plaintiff's unilateral decision to build the measure in the first place.  The cost of developing

5  SearchGuard would be the same whether SerpApi existed or not.  Those are sunk costs, not

6  damages caused by any alleged circumvention.  Consider a property owner who installs a security

7  system and then sues a trespasser for the installation bill.  The security system may have been

8  necessary to detect the intrusion, but its cost is not a consequence of the trespass.

9       Nor does Google plausibly allege that SerpApi "undermin[ed] Google's investment in the

10  copyrighted content it has licensed." Cmplt. ¶ 40.  Google does not allege that it acquired the right

11  of exclusion or that it was transferred to Google.  Google holds only non-exclusive licenses to

12  *display* the content.  Nothing SerpApi does undermines that right.  Google remains free to continue

13  displaying that content.  Google continues to receive what it bargained for when it entered into

14  license agreements with rights holders.  Nothing SerpApi allegedly did alters those rights.

15       Google's alternative theory – that SerpApi's server requests "threaten[] to disrupt Google's

16  relationship with content licensors," Cmplt. ¶ 40 – fares no better.  Google alleges no facts to

17  support this conclusory claim.  Nor is it plausible.  For licensed content, Google has non-exclusive

18  access and display rights, so its relationship is not "threatened."  For unlicensed content, any

19  suggestion that rights holders would flock to license the content – assuming Google even wanted

20  it – if SerpApi were enjoined, is pure speculation.  But even if such a tale could be spun, it is too

21  attenuated to constitute cognizable injury.  As Justice Scalia famously said, "'for want of a nail, a

22  kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a

23  blacksmith." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 287 (1992) (Scalia, J., concurring).

24  **IX.     CONCLUSION**

25       For the foregoing reasons, the Court should dismiss the Complaint.

26

27

28

Dated: February 20, 2026                    Respectfully submitted,


                                            */s/  Joseph E. Clark*
                                            Joseph E. Clark (SBN 281021)
                                            PROSKAUER ROSE LLP
                                            Eleven Times Square
                                            New York, New York 10036
                                            (212) 969-3000
                                            jclark@proskauer.com

                                            Colin R. Kass (*pro hac vice pending*)
                                            PROSKAUER ROSE LLP
                                            1001 Pennsylvania Ave., N.W.
                                            Washington, D.C. 20004
                                            (202) 416-6890
                                            ckass@proskauer.com

                                            David A. Munkittrick (*pro hac vice pending*)
                                            PROSKAUER ROSE LLP
                                            Eleven Times Square
                                            New York, New York 10036
                                            (212) 969-3000
                                            dmunkittrick@proskauer.com

                                            Heather Tovar (SBN 237004)
                                            Ad Astra Law Group, P.C.
                                            582 Market Street, 17th Floor
                                            San Francisco, CA 94104
                                            (415) 795-3579
                                            htovar@astralegal.com


                                            *Attorneys for Defendant SerpApi, LLC*