DAVID H. KRAMER, California State Bar No. 168452
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA  94304-1050
Telephone:  (650) 493-9300
Facsimile:  (866) 974-7329
Email:      dkramer@wsgr.com

LUCY YEN, California State Bar No. 224559
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
31 West 52nd Street, 5th Floor
New York, New York 10019
Telephone:  (212) 999-5800
Facsimile:  (866) 974-7329
Email:      lyen@wsgr.com

Attorneys for Plaintiff
GOOGLE LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| GOOGLE LLC, | Case No.: 4:25-cv-10826-YGR |
| Plaintiff, | **PLAINTIFF GOOGLE LLC'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| SERPAPI, LLC, | Date:   May 19, 2026 |
| Defendant. | Time:  2:00 P.M.<br>Courtroom:    1, 4th Floor |
| | Before: Hon. Yvonne Gonzalez Rogers |

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether Google states a claim for circumvention under 17 U.S.C. § 1201(a)(1)(A), where it alleges that it licenses copyrighted content from third-party rights holders and displays that content in its Search results; that it developed SearchGuard, a technological measure that requires the application of a JavaScript challenge-and-response to gain access to those Search results; and that SerpApi circumvents SearchGuard hundreds of millions of times per day by creating what it describes as "fake browsers," misrepresenting device information, automating the solution of CAPTCHAs, and syndicating fraudulently obtained authorization tokens to unauthorized machines worldwide.

2.      Whether Google states a claim for trafficking in circumvention technology and services under 17 U.S.C. § 1201(a)(2), where it alleges that SerpApi offers and provides its "Google Search API" as a paid service that cannot function without circumventing SearchGuard, and that SerpApi markets this service by promising customers they "don't need to care about … captcha, IP address, bots detection … [or] being blocked by Google" because SerpApi uses "advanced algorithms to bypass CAPTCHAs and other anti-bot mechanisms."

**TABLE OF CONTENTS**

**Page**

INTRODUCTION..................................................................................................................1

FACTUAL BACKGROUND ................................................................................................2

    A.    Google Search and Its Licensed Copyrighted Content ...........................................2

    B.    SerpApi's Operations .............................................................................................3

    C.    Google Develops SearchGuard ..............................................................................4

    D.    SerpApi Circumvents SearchGuard .......................................................................4

LEGAL BACKGROUND......................................................................................................6

ARGUMENT .........................................................................................................................7

    I.    Google Has Statutory Standing To Bring Its Anti-Circumvention Claims.............7

        A.    The Text of Section 1203 Forecloses SerpApi's Standing Argument. .......7

        B.    Google Alleges Injuries That the DMCA Was Designed to Prevent. ........10

    II.    Google Has the Authority to Apply Access Controls. ..........................................12

    III.    Google's Technological Measure Effectively Controls Access to the Copyrighted Works on its Search Results Pages. ..................................................14

        A.    SearchGuard Requires the Application of Information to Gain Access to Copyrighted Works.................................................................14

        B.    The Availability of Content Elsewhere Does Not Defeat Effectiveness. ..............................................................................................16

        C.    SearchGuard Is A Copyright Control Measure, Not A Mere Website Control Measure. ..................................................................................18

    IV.    SerpApi Circumvents SearchGuard. .....................................................................20

    V.    SerpApi Traffics in Circumvention Technology....................................................23

CONCLUSION ....................................................................................................................25

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*321 Studios v. MGM Studios, Inc.*,
307 F. Supp. 2d 1085 (N.D. Cal. 2004) ........................................................................ 16, 23

*Abramski v. United States*,
573 U.S. 169 (2014) ............................................................................................................ 22

*Avaya, Inc. v. Telecom Labs, Inc.*,
2012 WL 13035096 (D.N.J. May 1, 2012) ........................................................................ 13

*Bostock v. Clayton Cnty., Georgia*,
590 U.S. 644 (2020) ............................................................................................................ 20

*Broadcom Corp. v. Netflix Inc.*,
598 F. Supp. 3d 800 (N.D. Cal. 2022) ............................................................................... 16

*CDK Glob., LLC v. Tekion Corp.*,
2025 WL 1939951 (N.D. Cal. July 15, 2025) .................................................................... 24

*Columbia Pictures Indus. v. Galindo*,
2020 WL 3124347 (C.D. Cal. May 11, 2020) .................................................................... 10

*Comcast of Illinois X, LLC v. Hightech Electronics, Inc.*,
2004 WL 1718522 (N.D. Ill. July 29, 2004) ........................................................................ 8

*Craigslist, Inc. v. Kerbel*,
2012 WL 3166798 (N.D. Cal. Aug. 2, 2012) ..................................................................... 18

*Craigslist, Inc. v. Naturemarket, Inc.*,
694 F. Supp. 2d 1039 (N.D. Cal. 2010) ........................................................................ 19, 21

*Digital Drilling Data Systems, L.L.C. v. Petrolink Services, Inc.*,
965 F.3d 365 (5th Cir. 2020) .............................................................................................. 18

*DISH Network, L.L.C. v. Hatley*,
2017 WL 2312947 (W.D.N.C. May 26, 2017) ................................................................... 11

*Dish Network, L.L.C. v. SatFTA*,
2011 WL 856268 (N.D. Cal. Mar. 9, 2011) ....................................................................... 12

*Dish Network L.L.C. v. World Cable Inc.*,
893 F. Supp. 2d 452 (E.D.N.Y. 2012) ................................................................................ 23

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ........................................................................ 10, 12, 16, 20

*EchoStar Satellite, L.L.C. v. Viewtech, Inc.*,
543 F. Supp. 2d 1201 (S.D. Cal. 2008) ...................................................................... 8, 13, 14

*EchoStar Satellite LLC v. ViewTech, Inc.*,
  2011 WL 1522409 (S.D. Cal. Apr. 20, 2011) .................................................................. 25

*Egilman v. Keller*,
  401 F. Supp. 2d 105 (D.D.C. 2005) .............................................................................. 22

*Epic Games Inc. v. Araujo*,
  2025 WL 2019810 (C.D. Cal. June 24, 2025).......................................................... 15, 21, 23

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  31 F.4th 1180 (9th Cir. 2022)..................................................................................... 20, 22

*I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Sys., Inc.*,
  307 F. Supp. 2d 521 (S.D.N.Y. 2004) .............................................................................. 22

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  362 F. Supp. 3d 558 (N.D. Ill. 2019) ............................................................................ 15, 21

*Lenz v. Universal Music Corp.*,
  815 F.3d 1145 (9th Cir. 2016)......................................................................................... 9

*Lexmark International, Inc. v. Static Control Components, Inc.*,
  387 F.3d 522 (6th Cir. 2004)......................................................................................... 17

*Lexmark International, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .................................................................................................... 9

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
  629 F.3d 928 (9th Cir. 2010)..................................................................... 10, 14, 15, 17, 18

*Pearl Investments, LLC v. Standard I/O, Inc.*,
  257 F. Supp. 2d 326 (D. Me. 2003)............................................................................ 14, 16

*Philips N. Am. LLC v. Image Tech. Consulting, LLC*,
  2024 WL 4876961 (N.D. Tex. Nov. 22, 2024) ........................................................... 21, 23

*RealNetworks, Inc. v. Streambox, Inc.*,
  2000 WL 127311 (W.D. Wash. Jan. 18, 2000) ................................................................ 21

*Reddit, Inc. v. Anthropic PBC*,
  2026 WL 923020 (N.D. Cal. Mar. 30, 2026) ................................................................ 25

*Russello v. United States*,
  464 U.S. 16 (1983) ...................................................................................................... 8

*Sheldon v. Plot Commerce*,
  2016 WL 5107072 (E.D.N.Y. Aug. 26, 2016) ................................................................ 10

*Squires v. Lancaster Cnty. Prison*,
  2025 WL 3298948 (E.D. Pa. Nov. 26, 2025).................................................................. 10

*Ticketmaster L.L.C. v. Prestige Entm't, Inc.*,
  306 F. Supp. 3d 1164 (C.D. Cal. 2018)...................................................................... 11, 21

*Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*,
   315 F. Supp. 3d 1147 (C.D. Cal. 2018) ............................................................... 15, 18, 19

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
   507 F. Supp. 2d 1096 (C.D. Cal. 2007) ..................................................................... 15, 18

*Universal City Studios, Inc. v. Corley*,
   273 F.3d 429 (2d Cir. 2001) ............................................................................................. 12

*VidAngel LLC v. ClearPlay, Inc.*,
   703 F. Supp. 3d 1329 (D. Utah 2023) ............................................................................. 8, 9

*Viral DRM LLC v. Seven W. Media Ltd.*,
   768 F. Supp. 3d 1025 (N.D. Cal. 2025) ...................................................................... 2, 7, 8

**STATUTES**

17 U.S.C. § 501(b) ..................................................................................................................... 7

17 U.S.C. § 1201 ................................................................................................................*Passim*

17 U.S.C. § 1203 ............................................................................................................... 2, 7, 8

18 U.S.C. § 1030 .................................................................................................................. 20, 22

**MISCELLANEOUS**

4 Nimmer on Copyright § 12A.12[A] (2025 ............................................................................... 8

H.R. Rep. No. 105-551(I),(1998) ....................................................................................... 6, 9

H.R. Rep. Np. 105-551(II) (1998) ........................................................................................... 7

Ryan Mitchell, *Web Scraping with Python: Data Extraction
   from the Modern Web* (2024) ............................................................................................ 3

S. Rep. No. 105-190 (1998) ............................................................................................... 1, 6

**INTRODUCTION**

When Congress considered copyright for the digital age, it concluded that given the ease of making perfect, unauthorized copies, works would not be made widely available online unless access to them could be regulated through technological means. S. Rep. No. 105-190, at 8 (1998). To address that concern and promote the authorized distribution of copyrighted material, Congress added Section 1201 to the Copyright Act, making it unlawful to circumvent a technological measure that controls access to copyrighted works.  It also prohibited trafficking in technologies and services designed or marketed for such circumvention.

In keeping with Congress' vision, Google has helped make copyrighted content broadly accessible online. It licenses all kinds of content from third parties for display through its popular search engine.  Through its significant investment in that content, Google aims to differentiate its search services from others.  And to protect that investment, Google bars others from systematically accessing and taking the copyrighted content en masse.  It makes clear that users of its search services may not use automated means to access and "scrape" the content.  And it bolsters that directive with SearchGuard—a technological measure that prevents automated access to its search services and the copyrighted materials they contain.

SerpApi believes that it is entitled to vacuum up the content that Google pays to license, and sell that content to others.  To do so, it circumvents the technological access restrictions in SearchGuard on a staggering scale.  Each day it sends Google hundreds of millions of automated queries through what it describes as "fake browsers" designed to misrepresent itself and submits fraudulent "solves" to SearchGuard challenges in order to get at the copyrighted content that SearchGuard protects.  That is precisely the conduct Section 1201 forbids.

Google's Complaint states a straightforward claim for redress of SerpApi's statutory violations.  SearchGuard qualifies as a "technological measure" that effectively controls access to copyrighted works under Section 1201 because, in the ordinary course of its operation, it requires the application of information, with the authority of the copyright owner, to access the copyrighted materials in Google's Search results.  By bypassing SearchGuard through the submission of bogus information, SerpApi is circumventing Google's technological measure without the requisite

GOOGLE LLC'S OPPOSITION TO                                  -1-                          CASE NO.:  4:25-CV-10826-YGR
SERPAPI, LLC'S MOTION TO DISMISS

authorization.  And Google has been and continues to be harmed by SerpApi's misconduct, as it both undermines Google's extensive investment in and competitive advantage from the copyrighted content it licenses, and disrupts Google's relationships with third party licensors. That is all Google needs to show to establish that SerpApi is violating Section 1201(a)(1).  The fact that SerpApi is marketing its circumventions as a service to enable "uninterrupted and efficient data extraction" establishes an additional statutory violation, trafficking in violation of Section 1201(a)(2).

SerpApi does not deny the conduct with which it is charged.  Instead, taking a kitchen sink approach, it offers any argument it can dream up as to why that conduct should be permissible. But its arguments ignore Section 1201's text, its purpose, and its precedents.  SerpApi argues, for instance, that only copyright *owners* may bring Section 1201 claims.  ECF 22 at 6-11 ("Mot."). But "under the express language of the statute '[a]ny person' that is injured by the conduct may bring an action for [a Section 1201] violation." *Viral DRM LLC v. Seven W. Media Ltd.*, 768 F. Supp. 3d 1025, 1031 (N.D. Cal. 2025) (citing 17 U.S.C. § 1203(a)).  SerpApi also says SearchGuard does not "effectively control" access to copyrighted content because SerpApi can find and access the same content elsewhere.  Mot. 13.  That too is sophistry—it is not entitled to bypass a site's paywall protecting online books even if it might be able to obtain those books at the public library.  And it is impossible to square SerpApi's marketing boasts that it is "bypassing" Google's technological measures, with its claim that it does not "circumvent" under the statute given that "circumvention" is defined as "bypass[ing]" a technological measure (as well as "avoid[ing]," "deactivat[ing]," or "impair[ing]" one).  17 U.S.C. § 1201(a)(3).  None of these or the other arguments SerpApi has thrown at the wall withstands scrutiny.  The motion to dismiss should be denied.

## FACTUAL BACKGROUND

### A.     Google Search and Its Licensed Copyrighted Content

Google owns and operates Google Search, a search engine service central to Google's mission to "organize the world's information and make it universally accessible and useful." Compl. ¶ 13.  For decades, Google has visited billions of websites on the Internet, and with the

authorization of site operators, created a searchable index of their contents that users can query to find sites and content they may be looking for.  Google likewise helps sites be found, linking Google users to the content those sites contain, billions of times each day.

Over time, Google has invested heavily to develop and enhance Google Search, including by licensing a range of copyrighted content that it incorporates into its Search results pages.  *Id.* ¶¶ 2, 7, 14.  For example, Google licenses high-resolution copyrighted photographs for display in its Knowledge Graph and Knowledge Panels—sidebar features on its results pages that contain a snapshot of timely, curated information responsive to a user's query.  *Id.* ¶¶ 15-16.  Licensed copyrighted content also appears in other search-related services, including Google Shopping, where merchants supply copyrighted product images and descriptions, and Google Maps, where Google displays copyrighted terrestrial imagery, third-party photographs, and user-generated reviews.  *Id.* ¶ 17.  Google obtains and presents this licensed content to enrich the search experience for its users and thereby maintain its competitive standing.  *Id.* ¶ 24.

### B. SerpApi's Operations

SerpApi is a web scraping company founded in 2017 after its founder concluded that "scraping images from Google was an intensive process." *Id.* ¶ 18.[1] SerpApi offers its customers paid subscriptions to a "Google Search API"—a software service it advertises as a way to "Scrape Google." *Id.* ¶ 8.  Through this service, SerpApi uses automated means to automatically generate billions of artificial search requests to Google, copies Google's responses, including the licensed copyrighted content embedded in them, and sells that content to its customers for a fee.  *Id.* ¶ 19. SerpApi sends hundreds of millions of such automated queries to Google each day, a volume that has increased by as much as 25,000% over the past two years.  *Id.* ¶ 21.  And SerpApi specifically targets the copyrighted content that Google has licensed, offering and advertising specialized

---

[1] Web scraping is the practice of gathering online data through automated means, and is "most commonly accomplished by writing an automated program that queries a web server, requests data (usually in the form of HTML and other files that compose web pages), and then parses that data to extract needed information." Ryan Mitchell, *Web Scraping with Python: Data Extraction from the Modern Web*, at x (2024).

services to scrape the content presented in Google's Knowledge Panels, Google Shopping results, and Google Maps. *Id.* ¶ 22.

SerpApi does none of this with authorization from or compensation to Google or the owners of the copyrighted content it extracts. *Id.* ¶¶ 19-20. It pays no license fees, shares no revenue, and does not drive visitors to the original content creators' websites. *Id.* ¶ 20. The consequences for Google are severe: SerpApi's activities undermine Google's investments in licensed copyrighted content by making it available to Google's competitors for far less than Google pays to license it. And the behavior threatens to disrupt Google's relationships with the rights holders who depend on Google to protect their works. *Id.* ¶¶ 19, 24-25.

### C. Google Develops SearchGuard

To address these harms and protect its investments in copyrighted content, Google developed, at considerable expense, a technological protection measure called SearchGuard. *Id.* ¶ 27. SearchGuard is the product of tens of thousands of person-hours and millions of dollars of investment. *Id.* Its purpose is to prevent unauthorized third parties from automatically accessing Google's Search results at scale and appropriating the copyrighted content within them, while preserving a seamless search experience for ordinary users. *Id.*

SearchGuard works by sending a JavaScript "challenge" to search queries that Google receives from unrecognized sources. *Id.* ¶ 29. Google's system transmits JavaScript code that calls upon the user's browser to send back a "solve"—specific information regarding the browser and user generating the request. *Id.* For human users, the solve is straightforward: their browsers run the code and return the required information seamlessly. *Id.* But automated systems like SerpApi's, which submit queries at massive scale, typically cannot satisfy the challenge. As a result, SearchGuard denies them access to Google's Search results and the copyrighted works within them. *Id.* When SearchGuard launched in January 2025, it effectively blocked SerpApi and other scraping operations from automatically accessing Google's Search results. *Id.* ¶ 30.

### D. SerpApi Circumvents SearchGuard

SearchGuard's success with respect to SerpApi, however, was short-lived. SerpApi immediately began working to circumvent Google's technological measure and developed the

means to do so. *Id.* SerpApi's founder described the approach as "creating fake browsers using a multitude of IP addresses that Google sees as normal users." *Id.* ¶ 31. In fact, SerpApi's circumvention of SearchGuard takes multiple forms: among other things, it misrepresents the device, software, and location from which its queries originate; it solves SearchGuard challenges with a "legitimate" or manual request and then syndicates the resulting authorization to unauthorized machines around the world; and it uses automated means to bypass CAPTCHAs, the familiar online gates that pose a simple test to users to confirm they are humans rather than automated bots. *Id.* ¶ 32.

Rather than denying this misconduct, SerpApi treats its circumvention of SearchGuard as a selling point. In a blog post, SerpApi explained that SearchGuard had made its "web scraping more difficult," but boasted that it was "fortunate to be minimally impacted" because its services had "already pre-solved Google's JavaScript challenge." *Id.* ¶ 33. When Google strengthened SearchGuard's protections, SerpApi bragged that the update only "briefly interrupted" its operations because "thanks to the dedicated efforts of our engineers we were quickly able to resolve the problem." *Id.* And SerpApi publicly pledged to defeat any future protections Google might deploy, proclaiming that "at SerpApi we're confident in our ability to handle any new variations to these changes Google might introduce." *Id.*

SerpApi markets its circumvention capability to its customers, promising that they "don't need to care about … captcha, IP address, bots detection, maintaining user-agent, HTML headers, [or] being blocked by Google," because SerpApi uses "advanced algorithms to bypass CAPTCHAs and other anti-bot mechanisms, ensuring uninterrupted and efficient data extraction." *Id.* ¶ 34. In short, circumvention of Google's technological protections is not some incidental byproduct of SerpApi's business—it is its business.[2]

---

[2] SerpApi presses a hamfisted analogy between its behavior and Google's decades-old practice of indexing web content for purposes of operating its search engine. But surely SerpApi recognizes the difference. Unlike SerpApi, Google accesses websites with their authorization, and does not circumvent access control mechanisms to do so. Further, Google operates symbiotically with the sites it indexes, sending them billions of visitors. SerpApi, by contrast, is entirely parasitic; it takes exclusively for itself, at others' considerable expense.

GOOGLE LLC'S OPPOSITION TO SERPAPI, LLC'S MOTION TO DISMISS    -5-    CASE NO.: 4:25-CV-10826-YGR

**LEGAL BACKGROUND**

This lawsuit concerns the Digital Millennium Copyright Act's anti-circumvention provisions. 17 U.S.C. § 1201 *et seq.* Congress enacted those provisions in 1998 as a legal framework designed to "create[] the legal platform for launching the global digital on-line marketplace for copyrighted works" and to "facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of American creative genius." S. Rep. No. 105-190, at 2, 8; *see also* H.R. Rep. No. 105-551(I), at 9-10 (1998) (DMCA "intended to ensure a thriving electronic marketplace for copyrighted works on the Internet"); *id.* at 10 ("When copyrighted material is adequately protected in the digital environment, a plethora of works will be distributed and performed over the Internet."). To encourage the availability of works online, Congress chose to give teeth to the technological measures that protect against unauthorized access to copyrighted content. Section 1201 implements this framework in two complementary provisions relevant here. Section 1201(a)(1)(A) prohibits circumvention: "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A). Section 1201(a)(2) prohibits trafficking in circumvention technology: no person shall "manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof" that is primarily designed for circumvention, has limited commercially significant non-circumvention purpose, or is marketed for circumvention use. *Id.* § 1201(a)(2).

The statute defines its key terms. To "circumvent a technological measure" means "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). A technological measure "effectively controls access to a work" if it, "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B). And any person "injured by a violation of section 1201" may bring a civil action for damages. *Id.* § 1203(a).

Notably, the statute does not limit the ability to implement a qualifying technological measure to copyright owners themselves. Nor does it limit who may sue for a violation. Section 1203(a) authorizes suit by "[a]ny person injured by a violation"—not merely copyright owners. *Id.* That breadth is by design: Congress recognized that the statutory mandate against circumvention of access controls is served regardless of who implements the technological measure and regardless of who is injured by circumvention, so long as the measure effectively controls access to copyrighted works. *See, e.g.*, H.R. Rep. 105-551(II), at 22 (1998) (DMCA "govern[s] not only copyright owners in the marketplace for electronic commerce, but also consumers, manufacturers, distributors, libraries, educators, and on-line service providers"); S. Rep. 105-190, at 11 (Section 1201 "encourages technological solutions, in general, by enforcing private parties' use of technological protection measures with legal sanctions for circumvention").

## ARGUMENT

### I.    Google Has Statutory Standing To Bring Its Anti-Circumvention Claims.

### A.    The Text of Section 1203 Forecloses SerpApi's Standing Argument.

The plain text of the Copyright Act grants Google standing to bring an anti-circumvention claim. Section 1203 says that "[a]ny person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation." 17 U.S.C. § 1203(a). Google has standing because it is "a[] person injured by" SerpApi's violation of Section 1201. SerpApi argues that only copyright owners have standing, Mot. 6-11, but that argument asks the Court to add a restriction that Congress deliberately omitted.

By its very terms, Section 1203 does not limit standing to copyright owners, instead providing a cause of action to "[a]ny person injured." 17 U.S.C. § 1203; *see also Viral DRM*, 768 F. Supp. 3d at 1031. Indeed, Congress knew how to limit standing to copyright owners. In the same title that contains the DMCA, Section 501(b) restricts who may bring a copyright *infringement* claim to "[t]he legal or beneficial owner of an exclusive right under a copyright." 17 U.S.C. § 501(b). But when Congress created the anti-circumvention cause of action, it used the deliberately broader language of "any person injured," with no copyright ownership limitation. *Id.* § 1203(a). The contrast between these provisions is dispositive. When a statute grants standing

to "any person injured" in one section and limits it to "the legal or beneficial owner" in another, the broader provision must be given its natural meaning. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation omitted). SerpApi's effort to import Section 501(b)'s owner-only limitation into Section 1203(a) defies the statute's text.

Every court to address the question agrees. In *Comcast of Illinois X, LLC v. Hightech Electronics, Inc.*, the court denied a motion to dismiss a circumvention claim brought by Comcast—"undisputedly not the copyright holder"—because it "control[led] the technological measure that protects the copyrighted material" and was "a person injured from a violation." 2004 WL 1718522, at *6 (N.D. Ill. July 29, 2004). In *EchoStar Satellite, L.L.C. v. Viewtech, Inc.*, the operator of the DISH Network—a licensee, not an owner, of the programming at issue—had standing because it owned the access controls and was injured by their circumvention. 543 F. Supp. 2d 1201, 1205 (S.D. Cal. 2008). And this district recently confirmed that "'any person injured by a violation of section 1201 or 1202' may bring an action for such violation, even where that person was not the copyright owner or holder." *Viral DRM*, 768 F. Supp. 3d at 1031 (citations omitted); *see also VidAngel LLC v. ClearPlay, Inc.*, 703 F. Supp. 3d 1329, 1334-35 (D. Utah 2023) ("Section 1201 is plainly meant to encourage technological measures that control access to a copyrighted work," and the cause of action "is not limited exclusively to copyright owners" but extends to "owners of the technology alleged to have been circumvented"); 4 Nimmer on Copyright § 12A.12[A] (2025) (the DMCA affords "standing to plaintiffs who provide security measures rather than being content owners"). The Court need go no further to reject the standing argument that SerpApi has contrived.

It is also worth noting, however, that SerpApi's approach would produce untenable results. If only copyright owners could enforce Section 1201, then the platforms most responsible for making copyrighted works available online—the behavior Congress sought to encourage—would have no recourse when their access controls are circumvented. Netflix, Spotify, and Hulu are non-exclusive licensees of copyrighted works, not copyright owners, yet their business models depend

entirely on the integrity of their technological measures. Under SerpApi's reading, none could bring a Section 1201 claim against a party that circumvented those protections. The same would be true of satellite television providers like DISH Network, digital textbook platforms, and any other service that licenses content and controls access through technological measures. Congress did not create a statutory protection for access controls while simultaneously barring the parties that actually deploy them from enforcing it. *See VidAngel LLC*, 703 F. Supp. 3d at 1334-35.[3]

Unable to overcome the statutory text, SerpApi invokes *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), and argues that Google's injuries fall outside the DMCA's "zone of interests." Mot. 7-8. But *Lexmark* held that statutory standing is determined by "the meaning of the congressionally enacted provision creating a cause of action," applying "traditional principles of statutory interpretation." 572 U.S. at 128. Statutory interpretation begins with the text, and here the text is clear: "any person injured" may sue. *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151 (9th Cir. 2016) ("[I]f the language of a statute is clear, we look no further than that language in determining the statute's meaning.") (citation omitted). That ends the inquiry.

But even under *Lexmark*'s zone-of-interests framework, Google's standing is clear. Google—which licenses copyrighted content from rights holders, displays it with an access control measure to protect it, and suffers direct harm when that measure is circumvented—is precisely the kind of party whose injuries the DMCA was designed to address. Google's harm is not derivative of the copyright owners' harm; it is direct, flowing from the circumvention of Google's own technological measure and the impact on Google's own licensing investments and business relationships. It readily supports Google's standing.[4]

---

[3] While the clear text of the statute obviates resort to legislative history, that too confirms Google's standing. The Judiciary Committee emphasized the DMCA's role in encouraging online licensing, noting that the statute "address[ed] the problems posed by the possible circumvention of technologies … which will be used to protect copyrighted works in the digital environment *and to secure on-line licensing systems*." H.R. Rep. 105-551(I), at 10 (emphasis added).

[4] SerpApi's authorities are inapposite. They involve a default judgment and a *pro se* prisoner claim, and in neither case was the court confronted with an owner of a technological measure suing for

(continued...)

**B.      Google Alleges Injuries That the DMCA Was Designed to Prevent.**

SerpApi separately contends that Google has not alleged a "cognizable DMCA injury." Mot. 23-24. This argument fails both as a matter of law and on the face of the Complaint.

As a threshold matter, SerpApi cites no authority for the proposition that the DMCA imposes an injury requirement beyond Section 1203(a)'s standing provision. And the Ninth Circuit has expressly rejected any requirement that a Section 1201(a) claim have some nexus to an alleged copyright infringement. *MDY Indus., LLC v. Blizzard Ent., Inc.*, 629 F.3d 928, 952 (9th Cir. 2010) ("Congress created a distinct anti-circumvention right under § 1201(a) without an infringement nexus requirement … [We may not] override congressional intent and add a non-textual element to the statute."). Google need not show that SerpApi infringed a copyright. It must show only that SerpApi circumvented an access control measure and that Google was injured by that circumvention. It has amply done so.

Google alleges four categories of harm, each independently sufficient and each flowing directly from SerpApi's illicit circumventions of SearchGuard.

First, SerpApi undermines Google's investment in licensed copyrighted content by "making the content available to other services that need not incur similar costs." Compl. ¶ 24. Courts have consistently recognized such harm as cognizable. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (service that circumvents a protective measure "undermines the value of [plaintiffs'] copyrighted works"); *Columbia Pictures Indus., Inc. v. Galindo*, 2020 WL 3124347, at *2 (C.D. Cal. May 11, 2020) ("Not only is Defendant directly infringing Plaintiffs' copyrights, creating a financial loss to Plaintiffs, but Plaintiffs have provided evidence that the unlawfully distributed Copyrighted Works may undermine the value of Plaintiffs' legitimate licenses.").

Second, SerpApi "disrupt[s] Google's relationship with the rights holders who look to Google to prevent the misappropriation of the content Google displays." Compl. ¶ 25. This is not merely speculative or conclusory: Google alleges that "[a]t least one Google content partner,

---

circumvention of that measure. *Sheldon v. Plot Com.*, 2016 WL 5107072, at *9-10 (E.D.N.Y. Aug. 26, 2016); *Squires v. Lancaster Cnty. Prison*, 2025 WL 3298948 (E.D. Pa. Nov. 26, 2025).

Reddit, has already sued SerpApi for its misconduct." *Id.* A licensing partner resorting to litigation against the circumventor is concrete evidence that Google's licensing relationships—and the content ecosystem they support—are threatened by SerpApi's misconduct.

Third, SerpApi has forced Google "to incur substantial costs to develop and enhance technological measures to protect against SerpApi's unauthorized scraping." *Id.* ¶ 40. SerpApi dismisses these as "sunk costs." Mot. 24. It is not clear why SerpApi believes that characterization is helpful. SerpApi's circumventions deprived Google of the value of its expenditures, thereby damaging Google. Further, Google continues to incur costs in strengthening SearchGuard in response to SerpApi's escalating circumvention. SerpApi has publicly bragged that when Google "increased the difficulty" of SearchGuard, SerpApi's engineers "were quickly able to resolve the problem." Compl. ¶ 33. Google's damages thus continue to grow as SerpApi refuses to honor the barriers put in its path, and instead insists on circumventing them. *See Ticketmaster L.L.C. v. Prestige Ent., Inc.*, 306 F. Supp. 3d 1164, 1171 (C.D. Cal. 2018) (denying motion to dismiss where plaintiff alleged it was required "to continually escalate its anti-bot security measures, costing Ticketmaster thousands of dollars in damages"); *DISH Network, L.L.C. v. Hatley*, 2017 WL 2312947, at *4 (W.D.N.C. May 26, 2017) (harm from "the requirement to engage in costly security updates … aimed at stopping satellite piracy").

Fourth, Google is harmed "through the direct imposition of costs to respond to SerpApi's billions of automated queries." Compl. ¶ 40. These are not abstract infrastructure expenses; they are costs directly imposed by SerpApi's circumvention of SearchGuard, which permits it to flood Google with billions of automated queries that would otherwise be blocked.[5]

SerpApi's rampant circumvention of Google's technological measure has caused and is continuing to cause harm, for which Google, as the owner of the technological measure and a "person injured by a violation" of the DMCA, can seek relief under Section 1203.

---

[5] SerpApi's duplicative-recovery concern (Mot. 17) is not a proper basis for a motion to dismiss. Google's injuries are distinct from those suffered by the copyright owners. By creating a new anti-circumvention right, Congress aimed to ensure the widespread availability of copyrighted works online. Google has alleged harms to that interest, which are not the same as traditional harms caused by copyright infringement.

GOOGLE LLC'S OPPOSITION TO                    -11-                    CASE NO.: 4:25-CV-10826-YGR
SERPAPI, LLC'S MOTION TO DISMISS

## II.    Google Has the Authority to Apply Access Controls.

SerpApi's authorization argument rests on a misreading of the statute.  It contends that SearchGuard cannot qualify as a technical measure that effectively controls access because it was not "implemented" with the "authority of the copyright owner." Mot. 11-12.  But the statute does not say what SerpApi says it does.  The phrase "with the authority of the copyright owner" appears in two places in Section 1201(a)(3), and in both, it modifies the defendant's conduct—not the plaintiff's chosen access control method.

Section 1201(a)(3)(A) defines "circumvention" as conduct taken "without the authority of the copyright owner." Section 1201(a)(3)(B) defines an effective access control as one that requires the application of information "with the authority of the copyright owner, to gain access to the work." In both provisions, the phrase "authority of the copyright owner" addresses who may circumvent or gain access through the measure—not who may deploy it.  The statute "exempts from circumvention liability only 'those whom a copyright owner authorizes to circumvent an access control measure.'" *Disney Enters.*, 869 F.3d at 863 (discussing 1201(a)(3)(A)) (citation omitted); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 444 n.14 (2d Cir. 2001) (Section 1201 "frees an individual to traffic in encryption technology designed or marketed to circumvent an encryption measure if the owner of the material … authorizes that circumvention"). Neither provision requires the copyright owner to authorize the deployment of the access control in the first place.

SerpApi's reading would be unworkable.  Under its theory, DISH Network, DirecTV, and Spotify would each need advance permission from every copyright owner whose work they distribute before deploying a qualifying technological measure.  A satellite TV operator carrying thousands of channels would need individualized authorization from every content licensor before encrypting its signal.  No court has imposed such a requirement, because the statute does not contain one. *See, e.g.*, *Dish Network, L.L.C. v. SatFTA*, 2011 WL 856268, at *3-4 (N.D. Cal. Mar. 9, 2011) (granting summary judgment to satellite television provider for circumvention of technological measures it deployed, without discussion of whether those measures had been approved by every copyright owner).  SerpApi's only supporting authority is *Avaya, Inc. v.*

GOOGLE LLC'S OPPOSITION TO SERPAPI, LLC'S MOTION TO DISMISS                -12-                CASE NO.: 4:25-cv-10826-YGR

*Telecom Labs, Inc.*, 2012 WL 13035096 (D.N.J. May 1, 2012), which stated that "[c]ircumvention of a measure put in place by a copyright holder is necessary … to give rise to a § 1201(a)(1) violation." *Id.* at *7.  But that passing statement sheds no light on whether the copyright owner need authorize a specific measure because that was not at issue in the case.

Even if the statute required the copyright owner to authorize the deployment of SearchGuard—and it does not—Google has adequately alleged such authority.  Google licenses copyrighted works from third-party rights holders for display in its Search results.  Compl. ¶¶ 2, 16-17.  Those licenses necessarily contemplate that Google will exercise downstream control over how the content is accessed.  Where a plaintiff "contracts and purchases" copyright rights from the owner, it is "reasonable to infer" that the plaintiff "also has the authority to control the measures protecting" the content.  *EchoStar Satellite*, 543 F. Supp. 2d at 1206.

*EchoStar* is directly on point.  There, the operator of the DISH Network satellite broadcast system brought Section 1201 claims against the developer of receivers that allowed consumers to intercept DISH's encrypted signal.  *Id.* at 1204.  The defendant argued that EchoStar "failed to adequately allege that they have the authority of the copyright owner." *Id.* at 1206.  The court rejected that argument, reasoning that because EchoStar had "contracted and purchased the distribution rights of the programming"—a right belonging to the copyright owner under Section 106 of the Copyright Act—it was "reasonable to infer that EchoStar also has the authority to control the measures protecting the programming." *Id.*  Google's position is the same.  It licenses copyrighted photographs, images, and other content from rights holders for display through its search engine.  Compl. ¶¶ 2, 16-17.  It deploys SearchGuard to protect that content.  *Id.* ¶ 27.  Thus, just as in *EchoStar*, it is "reasonable to infer" that the rights holders who licensed content to Google for public display reasonably expected—and implicitly authorized—Google to protect that content through technological measures.  *EchoStar*, 543 F. Supp. 2d at 1206.  In other words, to the extent authorization to implement SearchGuard was needed, Google had it.[6]

---

[6] SerpApi cites no authority for the proposition that the DMCA "does not grant non-exclusive licensees the power to authorize copyright access controls." Mot. 12. SerpApi may not unilaterally

(continued...)

**III.    Google's Technological Measure Effectively Controls Access to the Copyrighted Works on its Search Results Pages.**

Section 1201 prohibits circumvention of a technological measure that "effectively controls access" to a copyrighted work.  17 U.S.C. § 1201(a)(1)(A).  SearchGuard satisfies that standard because it requires unrecognized users to solve a JavaScript challenge before accessing Search results containing copyrighted works.  Compl. ¶¶ 28-29.  SerpApi raises three principal arguments to the contrary: that SearchGuard does not require the application of information to gain access to copyrighted works, that the copyrighted content is available elsewhere online, and that SearchGuard is merely a "website control measure." *See* Mot. 12-19.  None of these has merit.  SearchGuard operates the same way as the CAPTCHAs, anti-bot systems, and authentication protocols that courts have recognized as effective access controls for decades—and SerpApi's own admissions confirm that SearchGuard works exactly as designed.

**A.    SearchGuard Requires the Application of Information to Gain Access to Copyrighted Works.**

A technological measure "effectively controls access to a work" if it, "in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B).  The question is whether the measure, as it ordinarily functions, requires something of the user before granting access.  *See Pearl Inv., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 350 (D. Me. 2003) ("The question of whether a technological measure 'effectively controls access' is analyzed solely with reference to how that measure works 'in the ordinary course of its operation.'").  Courts construe "effective" pragmatically: a measure need not "be strong or circumvention-proof"; rather, a measure need simply "provide some degree of control over access to a copyrighted work." *MDY*, 629 F.3d at 954 n.17.

SearchGuard satisfies this standard, restricting automated access to Google's Search results and the licensed content they contain.  In the ordinary course of SearchGuard's operation, it sends

---

limit the scope of a federal statute by inventing restrictions out of whole cloth with no basis in the statute's text and no support from any case law.

GOOGLE LLC'S OPPOSITION TO                    -14-                    CASE NO.:  4:25-CV-10826-YGR
SERPAPI, LLC'S MOTION TO DISMISS

a JavaScript "challenge" to queries from unrecognized sources and requires the querying browser to return specific information—a "solve"—to gain access to Google's Search results and the copyrighted content they contain. Compl. ¶¶ 28-29. That is the "application of information" the statute requires. The challenge-and-response mechanism controls access in the same way that CAPTCHAs control access to the pages they guard—and courts have consistently held that CAPTCHAs qualify as technological measures under Section 1201. *See Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1167 (C.D. Cal. 2018); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1112 (C.D. Cal. 2007) ("CAPTCHA … is a technological measure that regulates access to a copyrighted work"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 558, 571-72 (N.D. Ill. 2019) (similar). But SearchGuard goes further than a standard CAPTCHA. It is a bespoke, multilayered system representing tens of thousands of person-hours of development. Compl. ¶ 27. Courts have recognized that such custom-built solutions qualify under Section 1201. *See MDY*, 629 F.3d at 953-54 (9th Cir. 2010) (Warden anti-bot system); *Epic Games Inc. v. Araujo*, 2025 WL 2019810, at *2 (C.D. Cal. June 24, 2025) (Fortnite's anti-cheat bot detection).

*MDY* is particularly instructive. There, the Ninth Circuit held that Warden—background anti-bot software that scanned a player's system before permitting connection to Blizzard's servers to play an online video game—effectively controlled access to, among other things, the "dynamic, non-literal elements" of World of Warcraft, which it recognized "constitute a copyrighted work." 629 F.3d at 953-54. Likewise, *SearchGuard* controls access to copyrighted works such as the licensed content appearing in Google's Knowledge Graph, Google Shopping, and Google Maps, checking a user's authorization before allowing access to that content. *E.g.*, Compl. ¶¶ 15-17, 27-29.

Finally, SearchGuard was not merely *designed* to be an "effective" access control. Rather, SerpApi has admitted it functioned as intended: when it launched, SearchGuard "effectively blocked SerpApi from accessing Google's Search results." *Id.* ¶ 30. SerpApi had to invest engineering resources to develop circumvention tools. *Id.* ¶¶ 30-33. In a blog post, SerpApi explained that Google's improvements to SearchGuard had "interrupted [its] ability to perform

GOOGLE LLC'S OPPOSITION TO
SERPAPI, LLC'S MOTION TO DISMISS

-15-

CASE NO.: 4:25-CV-10826-YGR

web searches," but "thanks to the dedicated efforts of [SerpApi's] engineers," it was able to continue circumventing SearchGuard. *Id.* ¶ 33. A measure that successfully denies access until deliberately defeated is, by definition, effective.

### B.    The Availability of Content Elsewhere Does Not Defeat Effectiveness.

SerpApi also argues that SearchGuard cannot "effectively control access" because the copyrighted works licensed to appear in Google's Search results may be accessed elsewhere on the internet (or perhaps elsewhere in the world). Mot. 15-16. This argument fails as a matter of fact, law, and logic.

As a matter of fact, SerpApi's argument rests on an assumption it cannot support at the pleading stage. SerpApi does not—and cannot—show, from the "four corners of the complaint," that every copyrighted work Google licenses for display is freely available elsewhere. *See Broadcom Corp. v. Netflix Inc.*, 598 F. Supp. 3d 800, 804 (N.D. Cal. 2022). Google licenses content from a range of third-party rights holders. Compl. ¶¶ 2, 16-17. Whether each work is independently accessible without access controls is a factual question inappropriate for resolution on a motion to dismiss.

As a matter of law, courts have squarely rejected the proposition that alternative access paths defeat effectiveness. "Nothing in the legislative history suggests that [a defendant] did not circumvent an access control simply because there are authorized ways to access the [copyrighted] works." *Disney Enters.*, 869 F.3d at 865. The statute asks whether the measure requires information "in the ordinary course of its operation"—not whether unprotected copies exist elsewhere. *Pearl Investments*, 257 F. Supp. 2d at 350 ("The fact that [defendant] had alternative means of access to the works is irrelevant to whether the [technological measure] effectively controlled access to them."); *see also 321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085, 1095 (N.D. Cal. 2004) (rejecting argument that available circumvention tools defeat effectiveness, calling it "equivalent to a claim that, since it is easy to find skeleton keys on the black market, a deadbolt is not an effective lock to a door"). Under SerpApi's theory, it could freely bypass a paywall protecting copyrighted books because those books might be available at a public library. No court has endorsed that position.

As a matter of logic, SerpApi's argument proves too much. If the availability of copyrighted content through any alternative channel defeated a technological measure's effectiveness, then no streaming platform, digital library, or content aggregator could claim Section 1201 protection. A movie behind Netflix's technological measures can be rented on Amazon. A song behind Spotify's access controls can be heard on the radio. A community newspaper behind a paywall online might be available in hard copy from a newsrack. None of that makes Netflix's, Spotify's, or the newspaper's access controls ineffective for purposes of Section 1201.

SerpApi's reliance on the "front door/back door" analogy from *Lexmark International, Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir. 2004), and *MDY* is misplaced. In both cases, the content at issue was identically available through an alternative path controlled by the same party that deployed the access control. In *Lexmark*, the printer software was "freely readable" on the user's own cartridge, and Lexmark had "not directed any of its security efforts … to ensuring that its copyrighted work … cannot be read and copied." *Id.* at 547, 549. In *MDY*, the Ninth Circuit drew a critical distinction: it rejected the circumvention claim as to the game's "literal elements"—software code that Blizzard itself distributed on physical media for local installation—but sustained the claim as to the "dynamic non-literal elements" that could be accessed from Blizzard's servers only through Blizzard's technical measure, named Warden. 629 F.3d at 953-54. So too here, where SearchGuard "restricts access to [Google's] search results pages and the copyrighted content they contain." Compl. ¶ 4; *see also id.* ¶¶ 27-29.[7]

---

[7] SerpApi's reproduction of the Complaint's Willie Mays screenshot (Mot. 16) does not establish that Google's Search results are freely accessible without SearchGuard. SerpApi reproduced an image from a public court filing. That a screenshot appears in litigation does not mean the underlying search results page is accessible through google.com without circumventing SearchGuard—which is precisely why SerpApi devoted engineering resources to bypassing the technology. Compl. ¶¶ 30-31. SerpApi's reliance on *Digital Drilling Data Systems, L.L.C. v. Petrolink Services, Inc.*, 965 F.3d 365 (5th Cir. 2020), is similarly misplaced: there, the plaintiff itself left default credentials in place, creating an unprotected access path. *Id.* at 370. Google created no such backdoor.

### C.    SearchGuard Is A Copyright Control Measure, Not A Mere Website Control Measure.

SerpApi argues SearchGuard is a "website control measure," not a "copyright control measure," because it does not "separate or segregate copyrighted content from the reams of non-copyrighted public data" Google displays.  Mot. 2, 14, 17-18.  This distinction appears nowhere in the statute and has been adopted by no court.  Virtually every platform hosting copyrighted works also hosts unprotected material.  A DVD contains both copyrightable content and non-copyrightable elements.  A satellite signal carries both copyrighted programming and programming that may be uncopyrightable or in the public domain.  Ticketmaster's website contains both copyrighted page designs and uncopyrightable ticket data.  No court has required an access control to segregate the two.  *See Ticketmaster*, 315 F. Supp. 3d at 1167; *RMG Techs.*, 507 F. Supp. 2d at 1112; *Craigslist, Inc. v. Kerbel*, 2012 WL 3166798, at *9 (N.D. Cal. Aug. 2, 2012).  If SerpApi's rule were adopted, CSS would be a "DVD control measure" stripped of legal protection, and DISH Network's encryption would be a "signal control measure" rather than a copyright access control.  Yet courts have blessed both as "technological measures" that "effectively control access" to copyrighted material.

SerpApi's related contention—that SearchGuard's "purpose" is to protect advertising revenue, not copyrighted content (Mot. 17)—is purely conjectural and also irrelevant.  As an initial matter, SerpApi's speculation is at odds with the allegations of the complaint, where Google asserts that SearchGuard was intended to safeguard Google's significant investment in the licensed copyrighted content it displays in search results.  Compl. ¶ 27.  Regardless, the statute does not require that a plaintiff have a particular motive in implementing a technological measure.  It merely asks whether the measure "effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(1)(A); *See, e.g.*, *Ticketmaster*, 315 F. Supp. 3d at 1167 (Plaintiff's CAPTCHAs are technological measures that effectively control access to plaintiff's copyrighted website, even though their primary purpose is to prevent scalpers from purchasing and reselling tickets); *MDY*, 629 F.3d at 942 (Plaintiff's anti-bot system, "Warden," is a technological measure that effectively controls access to copyrighted game play, even though its primary purpose is to prevent automated

cheating); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1048, 1056 (N.D. Cal. 2010) (Plaintiff's CAPTCHA and telephone verification systems are technological measures that effectively control access to its copyrighted website, even though their primary purpose is to prevent spam and automated posting). In short, a measure that in fact controls access to copyrighted works satisfies the statute notwithstanding a defendant's speculation about what motivated it.

SerpApi also claims that SearchGuard is "ephemeral" and not "active" for long enough to constitute a technological measure. That is yet another imaginary requirement without support in the statute. Section 1201 asks whether the measure, in the ordinary course, requires information to gain access. It says nothing about how long the measure remains "active" after access is granted. The Ninth Circuit has held that "an access control measure can both (1) attempt to block initial access and (2) revoke access if a secondary check determines that access was unauthorized." *Id.* at 943. SearchGuard does both. Compl. ¶¶ 26-29.

In all events, SerpApi's argument proves too much. A moviegoer who buys a ticket and watches a film can later describe the plot to a friend; that does not render the theater's ticket booth an "ephemeral" an invalid access control. A CAPTCHA—which has repeatedly been recognized as a technological measure—operates only at the moment of access and imposes no continuing restriction on what a user does with the content once the page loads. *See Ticketmaster*, 315 F. Supp. 3d at 1167. If CAPTCHAs qualify—and they do—then SearchGuard qualifies too.[8]

Finally, SerpApi argues that under *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180 (9th Cir. 2022), "bot detection systems for public websites do not qualify for DMCA protection." Mot. 18-19. But *hiQ* says nothing of the sort. *hiQ* interpreted the Computer Fraud and Abuse Act

---

[8] SerpApi's odd assertion that the Court "must assume" that SerpApi has a "legal right to scrape non-copyrighted content on google.com and to 'circumvent' any anti-bot technology designed to interfere with such scraping" (Mot. 18 n.6) cites no legal authority or other support, so its basis is unclear. Google expressly prohibits automated access in its Terms of Service, a prohibition of which SerpApi is undoubtedly aware. Compl. ¶ 26. Google further instructs automated bots that they are not welcome through the robots.txt protocol. *Id.* It is not clear why in the face of those clear admonitions on top of SearchGuard's access control, that the Court must assume what SerpApi imagines.

("CFAA"), 18 U.S.C. § 1030, a very different statute with different elements and different purposes. It never mentioned Section 1201, never analyzed whether a bot-detection system qualifies under it as a technological measure that "effectively controls access" to copyrighted works, and certainly never held that Section 1201 is inapplicable to widely accessible websites. SerpApi's effort to transplant a CFAA holding into the DMCA conflates two distinct statutory frameworks. The CFAA asks whether access to "a computer" was "without authorization." 18 U.S.C. § 1030(a)(2). The *hiQ* court concluded that because LinkedIn's public pages were accessible without a login, scraping them was not "without authorization." 31 F.4th at 1195-96. Section 1201 asks a different question: whether a technological measure requires information to access copyrighted content. SearchGuard does, making it a "technological measure" that SerpApi is bound to respect under Section 1201. *See Disney Enters.*, 869 F.3d at 863 n.15 (rejecting applicability of CFAA cases to Section 1201 because they "interpret different phrases … in a different statute").

## IV.    SerpApi Circumvents SearchGuard.

The DMCA says that to "circumvent a technological measure" means to "descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner[.]" 17 U.S.C. § 1201(a)(3)(A). SerpApi brags about its ability to "bypass" CAPTCHAs and other anti-bot mechanisms. Compl. ¶¶ 32-34. That admission is dispositive. While SerpApi now claims not to know what that word means, (Mot. 20), it cannot self-servingly disclaim the statutory consequence. Courts interpret a statute according to "the ordinary public meaning of its terms." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 654 (2020). To bypass is to go around. To avoid is to evade. SerpApi does both.

SerpApi creates what it calls "fake browsers using a multitude of IP addresses that Google sees as normal users." Compl. ¶ 31. It misrepresents the device, software, and location from which its automated queries originate. *Id.* ¶ 32. It automates the defeat of CAPTCHAs. *Id.* It solves SearchGuard's JavaScript challenges through impersonation and then syndicates the resulting authorization tokens to unauthorized machines worldwide. *Id.* And it markets this capability as

the core of its product, assuring customers they "don't need to care about … captcha, IP address, bots detection, maintaining user-agent, HTML headers, [or] being blocked by Google." *Id.* ¶ 34. Taken together, these allegations describe a company whose entire operation is engineered to avoid and bypass SearchGuard.  The statute forbids exactly that.

Every court to consider conduct similar to SerpApi's has reached the same conclusion: it is circumvention.  In *Ticketmaster*, it was circumvention when defendants used "bots and dummy accounts" and "colocation facilities with high speed bandwidth, random number and letter generators, and other evasive methods in order to avoid detection." 306 F. Supp. 3d at 1170.  In *Craigslist*, it was circumvention when the defendant used an "automated CAPTCHA bypass feature." *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1050 (N.D. Cal. 2010).  In *In re Dealer Management Systems*, the court held that "use of an automated program to bypass CDK's use of a CAPTCHA does avoid and/or bypass the technological measure." 362 F. Supp. 3d at 571-72.  And in *RealNetworks*, it was circumvention when the defendant built software that "mimick[ed] a RealPlayer" to bypass RealNetworks's authentication procedure.  *RealNetworks, Inc. v. Streambox, Inc.*, 2000 WL 127311, at *4 (W.D. Wash. Jan. 18, 2000); *see also Epic Games*, 2025 WL 2019810, at *2 (circumvention where defendant created "fake accounts" and "used a hardware spoofer to alter the serial numbers of his devices to evade Plaintiff's hardware ID bans."); *Philips N. Am. LLC v. Image Tech. Consulting, LLC*, 2024 WL 4876961, at *10 (N.D. Tex. Nov. 22, 2024) (circumvention where defendants "us[ed] a fake IST certificate to get access to … MRI machines").  SerpApi's conduct is circumvention in violation of Section 1201 too.[9]

Next, SerpApi invokes the "rule of lenity," arguing that because Section 1201 can carry criminal penalties alongside civil ones, "bypass" and "avoid" must be given their "narrowest reasonable reading." Mot. 20.  That rule applies when there is "grievous ambiguity or uncertainty in the statute." *Abramski v. United States*, 573 U.S. 169, 188 n.10 (2014) (citations omitted).  But

---

[9] SerpApi tries to distract from this obvious conclusion by again citing to *hiQ* and claiming it "sets the standard for establishing circumvention" (Mot. 20)—but *hiQ* involved a different statute (the CFAA) that does not even mention the words circumvention, bypass, or avoid, much less define them. *See hiQ Labs*, 31 F.4th at 1194 (interpreting 18 U.S.C. § 1030). *hiQ* simply has nothing to say about the meaning of circumvention under Section 1201.

GOOGLE LLC'S OPPOSITION TO
SERPAPI, LLC'S MOTION TO DISMISS

-21-

CASE NO.:  4:25-CV-10826-YGR

there is nothing grievously ambiguous about the ordinary meanings of bypass and avoid. Indeed, SerpApi itself boasts that its service "bypass[es]" CAPTCHAs and anti-bot mechanisms; it knows what bypass means and it knows its service does it. In any event, under the rule of lenity, SerpApi claims, bypass and avoid mean something like "lock-picking or wall-breaking." Mot. 21. Those readings are not narrow, they are nonsensical. Adopting a reading of Section 1201 that narrow would gut the statute and reject all manner of precedent.

Finally, SerpApi tries to dispute whether particular conduct described in the Complaint constitutes circumvention. It does. SerpApi claims that solving JavaScript challenges and then syndicating the resulting authorization to "unauthorized machines" is not circumvention. *Id.* 21-22. But those downstream machines use the illegitimate authorization so that they never receive the JavaScript challenge, never have to provide a solve, and can access Google's content using the fraudulently obtained authorization. *See* Compl. ¶¶ 29, 32-33. That is by definition bypassing and avoiding a technological measure. SerpApi cannot analogize its conduct to the cases involving "otherwise legitimate, owner-issued password[s]." Mot. 22 (citing *Egilman v. Keller*, 401 F. Supp. 2d 105, 114 (D.D.C. 2005); *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Sys., Inc.*, 307 F. Supp. 2d 521, 531-33 (S.D.N.Y. 2004)). By syndicating the authorizations, SerpApi is not *sharing* a password; it is empowering countless bots to *avoid ever having to enter* a password, all on a massive scale. That is classic circumvention.

SerpApi also disputes whether its deception in accessing Google qualifies as circumvention. Mot. 22. Again, it does. SerpApi admits that it goes to great lengths to "avoid being detected and blocked by Google," including the "latest technologies to mimic human behavior." Compl. ¶ 23. When it does so to bypass or avoid Google's technological measure, it violates Section 1201.[10] In *Epic Games Inc. v. Araujo*, for example, a player was banned from

_____

[10] By contrast, in *Dish Network L.L.C. v. World Cable Inc.*, defendants were authorized recipients of satellite television who signed agreements not to re-broadcast or transmit DISH Network signals, but did so. 893 F. Supp. 2d 452, 457 (E.D.N.Y. 2012). Defendants' "misrepresenting that they intended to use their DISH Network accounts solely for residential or commercial viewing" had nothing to do with the "digital walls" that Dish Networks applied, *id.* at 463-64, whereas SerpApi's fraudulent application of information bypasses SearchGuard.

Fortnite for using software that was "specifically designed to avoid detection by [Epic's] anti-cheat measures." 2025 WL 2019810, at *2.  But the player "continued his wrongful conduct by creating at least three fake accounts" and "used a hardware spoofer to alter the serial numbers of his devices to evade Plaintiff's hardware ID bans and continue accessing Fortnite." *Id.*  That was "circumvention" under Section 1201.  *Id.*; *see also Philips N. Am.*, 2024 WL 4876961, at *10 ("Defendants circumvented Philips' technological measures by using a fake IST certificate to get access to … MRI machines.").

As statutory text, precedent, and purpose confirm, SerpApi's conduct plainly amounts to circumvention in violation of Section 1201.

## V.    SerpApi Traffics in Circumvention Technology.

Section 1201(a)(2) prohibits trafficking in circumvention services.  It provides that no person shall "manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, [or] service" that meets any one of three conditions: (A) it is "primarily designed or produced for the purpose of circumventing" a technological measure; (B) it has "only limited commercially significant purpose or use other than to circumvent" a technological measure; or (C) it "is marketed … with [defendant's] knowledge for use in circumventing" a technological measure.  17 U.S.C. § 1201(a)(2).  "[O]nly one of the three enumerated conditions must be met in order to find a violation." *321 Studios*, 307 F. Supp. 2d at 1094.  SerpApi's conduct violates all three, but any one alone is sufficient.

SerpApi begins with a threshold argument that—yet again—ignores the statute's plain text and Google's allegations: that SerpApi cannot be liable for trafficking because Google does not allege the "sale of circumvention *technology*." Mot. 22.  But the statute is not limited to the sale of technology; it prohibits "offer[ing]" or "provid[ing]" "any technology, product, [or] service." 17 U.S.C. § 1201(a)(2).  And Google's Complaint challenged exactly that: SerpApi's "services and technology." *E.g.*, Compl. ¶¶ 46-48.  SerpApi does not, and cannot, dispute that it offers and provides services and technology.  And because those services and technology are marketed and designed to circumvent SearchGuard, SerpApi has violated Section 1201(a)(2).

**Marketing.** As detailed above (at 5-6, 24-25), and as SerpApi essentially admits (*see* Mot. 22), it markets its service for circumvention. SerpApi promises customers that they "don't need to care about … captcha, IP address, bots detection, maintaining user-agent, HTML headers, [or] being blocked by Google," because SerpApi uses "advanced algorithms to bypass CAPTCHAs and other anti-bot mechanisms, ensuring uninterrupted and efficient data extraction." Compl. ¶ 34. It publicly bragged about defeating SearchGuard and pledged to circumvent any future protections Google may deploy. *Id.* ¶¶ 31, 33. Even in moving to dismiss, SerpApi concedes that it "advertises its technological prowess" in scraping content from Google's services. Mot. 22. This easily satisfies Section 1201(a)(2)(C), and the Court need go no further. *See CDK Glob., LLC v. Tekion Corp.*, 2025 WL 1939951, at *10 (N.D. Cal. July 15, 2025) (marketing claim adequately pled based on defendant's business model and marketing materials).

**Designed For Circumvention or Limited Commercially Significant Purpose**. It is no surprise that SerpApi's service, which is marketed for circumventing SearchGuard and accessing Google Search results, was primarily designed to circumvent, and has little (if any) commercially significant purpose other than to circumvent Google's technological measure. The service exists to access Google's search results, including the licensed copyrighted content they contain, by automated means. *E.g.*, Compl. ¶ 8. Those search results are protected by SearchGuard. *Id.* ¶¶ 26-29. Circumvention is SerpApi's "principal service" and, indeed, SerpApi cannot fulfill its customers' demands without circumventing SearchGuard. *See id.* ¶¶ 31-34.

SerpApi contends its service has commercially significant uses beyond circumvention because the "vast majority" of the content it scrapes from Google is not copyrighted. Mot. 23. This argument misses the mark for two reasons. First, the question under Section 1201(a)(2)(B) is whether the purpose is circumvention—not whether the content obtained through circumvention includes some non-copyrighted material. SerpApi's service cannot access any Google search results—copyrighted or otherwise—without circumventing SearchGuard. A service whose every commercial function depends on defeating an access control has, by definition, limited (or no) purpose "other than to circumvent." 17 U.S.C. § 1201(a)(2)(B); *see EchoStar Satellite LLC v. ViewTech, Inc.*, 2011 WL 1522409, at *3 (S.D. Cal. Apr. 20, 2011) (granting summary judgment

on § 1202(a)(2) claim where defendant's circumvention device was primarily used for that purpose). Second, on a motion to dismiss, this Court need not credit SerpApi's self-serving characterization that its service's value lies in accessing non-copyrighted content. As the Complaint lays out in detail, SerpApi specifically targets Google's licensed copyrighted content—offering specialized services to scrape Knowledge Panels, Google Shopping, and Google Maps, all of which feature copyrighted works obtained from third parties. Compl. ¶ 22. Circumvention is its only purpose. Google's trafficking claim should proceed.

## CONCLUSION

Google has amply stated a Section 1201 claim based on SerpApi's campaign of circumvention. Accordingly, the Court should deny SerpApi's motion to dismiss. However, if the Court finds Google's claim lacking in some respect, Google requests leave to amend that claim and add others that apply in this context. *See Reddit, Inc. v. Anthropic PBC*, 2026 WL 923020 (N.D. Cal. Mar. 30, 2026) (recognizing viability of breach of contract, tortious interference and unfair competition claims against unauthorized scraping).

Respectfully submitted,

Dated: April 6, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:  */s/ David H. Kramer*
David H. Kramer
E-mail: dkramer@wsgr.com

Attorneys for Plaintiff
GOOGLE LLC