Joseph E. Clark (SBN 281021)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
jclark@proskauer.com

*Attorney for Defendant SerpApi, LLC*

Additional Counsel listed on Signature Page

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GOOGLE LLC, <br><br> Plaintiff, <br><br> v. <br><br> SERPAPI, LLC, <br><br> Defendant. | Case No. 25-cv-10826-YGR <br> Hon. Yvonne Gonzalez Rogers <br><br> Time: May 19, 2026, 2:00 p.m. <br> Court: Courtroom 1 – 4th Floor |

## <u>SERPAPI'S REPLY TO ITS MOTION TO DISMISS</u>

## TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   GOOGLE LACKS DMCA STANDING ............................................................. 2

III.  GOOGLE FAILS TO ALLEGE COPYRIGHT-OWNER AUTHORITY ........................ 5

IV.   SEARCHGUARD IS NOT AN EFFECTIVE COPYRIGHT ACCESS
      CONTROL ........................................................................................................ 7

      A.    SearchGuard Is Not Effective Because the Content Is Available
            Unprotected. ...........................................................................................7

      B.    SearchGuard Is Not a Copyright Control Measure Because It Is Designed
            to Prevent Lawful Public Scraping. ..........................................................9

      C.    Bot Detection Systems Do Not "Effectively Control" Access to Public
            Websites. ...............................................................................................10

V.    SERPAPI DOES NOT "CIRCUMVENT" ANY ACCESS CONTROL ........................ 12

VI.   GOOGLE FAILED TO PLAUSIBLY ALLEGE TECHNOLOGY
      TRAFFICKING ............................................................................................... 13

VII.  GOOGLE FAILS TO ALLEGE COGNIZABLE DMCA INJURY .............................. 14

VIII. CONCLUSION ................................................................................................. 15

## TABLE OF AUTHORITIES[1]

**Cases**

*321 Studios v. MGM Studios, Inc.*,
   307 F. Supp. 2d 1085 (N.D. Cal. 2004) .................................................................................8

*Abramski v. U.S.*,
   573 U.S. 169 (2014).............................................................................................................12

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)...............................................................................................................7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)...............................................................................................................3

*Columbia Pictures Indus., Inc. v. Galindo*,
   2020 WL 3124347 (C.D. Cal. 2020).....................................................................................15

*Craigslist, Inc. v. Kerbel*,
   2012 WL 3166798 (N.D. Cal. 2012) ....................................................................................10

*Disney Enters., Inc. v. VidAngel*,
   869 F.3d 848 (9th Cir. 2017) ............................................................................................8, 15

*EchoStar Satellite, L.L.C. v. Viewtech, Inc.*,
   543 F. Supp. 2d 1201 (S.D. Cal. 2008)..................................................................................7

*Epic Games Inc. v. Araujo*,
   2025 WL 2019810 (C.D. Cal. 2025)......................................................................................12

*Healthcare Advocs., Inc. v. Harding, Earley, Follmer & Frailey*,
   497 F. Supp. 2d 627 (E.D. Pa. 2007) ...................................................................................13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   31 F.4th 1180 (9th Cir. 2022) ...................................................................................... *passim*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 122 (2014)..................................................................................................... *passim*

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
   629 F.3d 928 (9th Cir. 2010) ........................................................................................1, 7, 8

*Pearl Invs., LLC v. Standard I/O, Inc.*,
   257 F. Supp. 2d 326 (D. Me. 2003) ......................................................................................8

[1] Unless otherwise specified, all emphasis added, capitalizations conformed without brackets, and internal citations and quotation marks omitted.

*Philips N. Am. LLC v. Image Tech. Consulting, LLC*,
 2024 WL 4876961 (N.D. Tex. 2024) ..................................................................................12

*Project Travel, LLC v. Terra Dotta, LLC*,
 2026 WL 890422 (M.D. Fla. 2026) ....................................................................................13

*RealNetworks, Inc. v. Streambox, Inc.*,
 2000 WL 127311 (W.D. Wash. 2000) .................................................................................12

*Russello v. U.S.*,
 464 U.S. 16 (1983) ...............................................................................................................3

*Sheldon v. Plot Com.*,
 2016 WL 5107072 (E.D.N.Y. 2016) .....................................................................................3

*Squires v. Lancaster Cnty. Prison*,
 2025 WL 3298948 (E.D. Pa. 2025) ..................................................................................3, 4

*Ticketmaster L.L.C. v. Prestige Entm't, Inc.*,
 306 F. Supp. 3d 1164 (C.D. Cal. 2018) .........................................................................12, 13

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
 507 F. Supp. 2d 1096 (C.D. Cal. 2007) .............................................................................10

*Ticketmaster, L.L.C. v. Prestige Entm't West, Inc.*,
 315 F. Supp. 3d 1147 (C.D. Cal. 2018) .............................................................................10

*Van Buren v. U.S.*,
 593 U.S. 374 (2021) .................................................................................................2, 12, 13

*VidAngel LLC v. ClearPlay, Inc.*,
 703 F. Supp. 3d 1329 (D. Utah 2023) ..............................................................................3, 4

*Viral DRM, LLC v. Seven W. Media Ltd.*,
 768 F. Supp. 3d 1025 (N.D. Cal. 2025) ...............................................................................4

**STATUTES**

17 U.S.C. § 1201 ........................................................................................................... *passim*

**OTHER AUTHORITIES**

H.R. Rep. 98-894 (1984) ...........................................................................................................11

H.R. Rep. 105-551(I) & (II) (1998) ...................................................................................4, 6, 11

Nimmer on Copyright, § 12A.12[A] (2025) ...............................................................................4

S. Rep. 105-190 (1998) ...............................................................................................................6

## I.    INTRODUCTION

Google is not shy about what it wants.  It wants to shut down SerpApi—to use a copyright statute to lock up a website filled with content Google does not own, has not created, and could not copyright if it tried.  But the DMCA does not transform the public web into a private enclave just because a search engine sprinkles a few non-exclusively licensed images on top of it.

*No Standing*.  Google concedes it is neither a copyright owner nor an exclusive licensee.  Instead, it says neither is required.  But that ignores the Supreme Court's controlling decision in *Lexmark*, limiting standing to those in the Act's "zone of interest."  The statute and its legislative history concern *only* "copyright owners," not website operators or non-exclusive licensees.

*No Authority*.  Google concedes that it does not have "the authority of the copyright owner" for anything, though the definition of a qualifying technological measure requires it.  Instead, Google says it is enough that it wants to block bots.  That is not what the statute says.

*No Always-On Protection*.  Google concedes it seeks to protect information it scraped from the public web and to transform it into its own private property.  But the controlling decisions in *Blizzard* and *Lexmark* do not afford protection where the copyright owner makes the same content available elsewhere without protection.  In response, Google says 'aha, I'm not the copyright owner.'  That is a confession of the Act's inapplicability, not a saving grace.

*Copyright Protection, Not Website Protection*.  Google argues that even if the DMCA is limited to its non-exclusively licensed images, it can claim the Act's protection.  But it cannot shield its entire website by commingling a few licensed images with the vast repository of public human knowledge.  The Act requires the measure to be reasonably tailored to the copyright.

*The Public's Right of Access*.  In *hiQ*, the Ninth Circuit recognized the public's right to access public websites, even those protected by antibot measures.  The DMCA does not strip away that right.  The right of access – authorized in law – means no key is "required" to *lawfully* "gain access" to the content.  The DMCA does not apply to *public* portions of *public* websites.

*No Circumvention*.  Google concedes that SerpApi does not descramble, decrypt, remove, deactivate, or impair Google's SearchGuard technology.  It only accuses SerpApi of solving

JavaScript challenges by mimicking a human browser. But solving is not avoiding. *Van Buren* and *hiQ* preclude such an expansive read of "avoidance." Using a key is not avoiding the lock.

*No Trafficking*. Google has no trafficking claim because it does not allege the sale of services that enable *customers* to *themselves* circumvent SearchGuard. And whatever SerpApi sells, it has significant legitimate commercial purposes. Its services are used to access non-copyrighted content. Google sees vice in that, but its argument turns the statutory text on its head.

*No Injury*. Google lacks Article III standing because it has no copyright interest, and its claim that some unspecified relationships have been "impaired" does not suffice. Its only other claimed damage – the cost to operate and ringfence its public website – is no DMCA injury.

## II.    GOOGLE LACKS DMCA STANDING

Google lacks standing because it concedes it is neither copyright owner nor exclusive licensee. Because the Digital Millennium <u>Copyright</u> Act only protects *copyright interests* – not cryptologists or technology vendors – Google's interest as a search engine "organizing" public information on the web, adorned with a few non-exclusively licensed pictures, does not suffice.

*Public Search Engines Lack DMCA Standing.* Google does not deny that *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 122, 129-32 (2014), controls. There, the Supreme Court re-affirmed that "the modern 'zone of interests' formulation … applies to ***all*** statutorily created causes of action," and is "a requirement of general application" against which "Congress is presumed to legislate" even where a statute authorizes suit by "any person who believes that he or she is or is likely to be damaged." *Id*. In doing so, the Court rejected the ***same*** textualist argument Google advances here.

Google insists it need only show that it is "a person injured by" a statutory violation. But *Lexmark* limited Lanham Act standing to businesses with a "*commercial* interest in reputation" – despite no express statutory limitation – because the statute only evinced concern about "unfair competition." *Id*. So, even though "a consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact," the Court held, "he cannot invoke the [statute's] protection." *Id*. The same reasoning applies here.

Google's alleged injuries as a public search engine have nothing to do with copyright. Copyright owners are injured *only* when their works are accessed, but Google suffers the *same* injury whether or not the accessed content is copyrighted. That places it outside the DMCA's zone of interest. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487-88 (1977) (injury "not of the type that the statute was intended to forestall" where the plaintiff "would have suffered the identical 'loss'" if the statute had not been violated).

In response, Google asks the Court to disregard *Lexmark*. Because Congress enumerated specific classes of plaintiffs for infringement but not for the DMCA, Google says Congress *implicitly* displaced the zone-of-interest inquiry. G.Br. 7. But Congress's "any person injured" formulation just means the standard "zone of interest" framework applies—not that Congress abandoned it. As the Supreme Court explained, the inquiry "applies unless it is *expressly* negated," and "as a practical matter," it "is ***never*** negated." *Lexmark*, 572 U.S. at 129.

But even if *Lexmark* permitted *implied* exceptions, it's not warranted here. Google relies on *Russello v. U.S.*, 464 U.S. 16 (1983), which concerned RICO *liability*, not standing or the zone-of-interest. Nor can Google extract any magic talisman from the mere observation that differences between two "*immediately*" successive *subsections* of the *same* statute, enacted together, were deliberate because they arose from deletions in an "earlier version of the bill." That is not our statute. Although § 501 and the later-enacted § 1203 differ – the former lacks an injury requirement, the latter lacks plaintiff enumeration – those structural differences do not suggest Congress intended to opt out of *Lexmark* or to permit suit untethered to copyright interests.

Google's other cases also provide no solace. It wrongly claims that "every court to address the question agrees" that the phrase "any person injured" requires *only* injury-in-fact. G.Br. 8. To the contrary, every court to consider *Lexmark* and the DMCA rejects that argument, and several ***expressly*** limit standing to copyright owners.[2] Google's cases, in contrast, ***all*** – without exception

---

[2] *See VidAngel LLC v. ClearPlay, Inc.*, 703 F. Supp. 3d 1329 (D. Utah 2023); *Sheldon v. Plot Com.*, 2016 WL 5107072, *10 (E.D.N.Y. 2016); *Squires v. Lancaster Cnty. Prison*, 2025 WL 3298948, *3 (E.D. Pa. 2025). Google denigrates *Sheldon* as a default-judgment case, but the court entered judgment only after requiring supplemental information to address "concerns that [the plaintiff] might not own the copyright" and would therefore lack standing. Similarly, *Squires*'s

– failed to conduct *Lexmark*'s required zone-of-interest inquiry, either because they pre-dated *Lexmark* or relied on cases that did.[3]

Abandoning its literalist argument, Google next says Congress at least intended the DMCA's zone of interest to extend to designers or deployers of antibot technologies. But nothing in the statute or its legislative history expresses concern for technologists. Those concerns are reserved exclusively for "copyright owners." *See* S.Br. 7-10 (compiling legislative history). Google divines the opposite from a solitary reference in a House Report to "on-line licensing systems." G.Br. 9 n.3 (*citing* H.R. Rep. 105-551(I), at 10). But Google is not an online licensing system. And it ignores the *next* sentence of the Report, which states that the Act's purpose is "to make it unlawful to defeat technological protections used **by copyright owners** to protect **their** works." *Id*. That *copyright owners* may distribute their works "on-line" hardly suggests concern for technology vendors with no copyright interests of their own.

*Google Lacks Standing as a Non-Exclusive Licensee.* Retrenching, Google says it at least has standing for the *non-exclusively licensed* pictures it displays. But Google doesn't grapple with the legislative history expressing concern *only* for "copyright owners," or with the statute that gives "copyright owners" *sole* discretion to authorize access controls. That reflects the DMCA's design: to *bolster* owner protections by giving them an *additional* right of exclusive access. It would be anomalous to give non-exclusive licensees that dangling right alone, but nothing else.

Google also ignores the fundamental difference between exclusive and non-exclusive licensees. An exclusive licensee bargains for the right to exclude *all* others—and thus for the right to control access. A non-exclusive licensee secures *only* freedom from suit for its *own* use—an

---

rigorous application of *Lexmark* – dismissing claims where the plaintiff lacked "any ownership interests" – is not diminished just because the plaintiff sued *pro se*.

[3] Google cites two conflicting post-*Lexmark* cases. In *VidAngel*, 703 F. Supp. 3d at 1334, the court **denied** standing, finding a literal read of "any person injured" inconsistent with *Lexmark*. In *Viral DRM, LLC v. Seven W. Media Ltd.*, 768 F. Supp. 3d 1025 (N.D. Cal. 2025), the Court cited only pre-*Lexmark* cases, without addressing *Lexmark* or the DMCA's zone of interests. *Nimmer on Copyright* similarly provides no support because it merely catalogs cases that pre-date *Lexmark* or ignore the zone-of-interests requirement.

interest not invaded when access controls are circumvented. At most, Google's interest boils down to regret for paying license fees when others didn't. Envy does not create standing.

Google retorts that, without extending access rights to non-exclusive licensees, the sky will fall because then Netflix and Hulu will be left in the cold. G.Br. 8. Not so. Both employ CFAA-qualifying authentication measures, so their content is fully protected whether copyrighted or not. Of course, if they distribute original programming and own the copyright, they may also invoke the DMCA. But, as mere non-exclusive licensees, they cannot. Not *every* statute cures *every* ill. That Google chose not to employ CFAA-qualifying authentication is no reason for the Court to stretch the DMCA beyond its intended purpose.

## III.    GOOGLE FAILS TO ALLEGE COPYRIGHT-OWNER AUTHORITY

Google concedes it lacks the "authority of the copyright owner" to implement any access control. But it insists that no such authority is required, or that if it is, it can be implied in law for its few non-exclusively licensed images. Neither argument avails.

*The DMCA Requires Copyright Authority to Implement Access Controls*. The DMCA limits its protection to qualifying access controls: a measure that, "in the ordinary course of its operation, requires the application of information, or a process or a treatment, *with the authority of the copyright owner*, to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). The text requires the copyright owner to authorize the measure. Google does not allege that.

Instead, it says the statute does not mean what it says. It sees ambiguity in "the phrase 'authority of the copyright owner,'" which it claims, "addresses who may circumvent or gain access through the measure—not who may deploy it."[4] G.Br. 12. But Google does not dispute that a qualifying measure requires copyright owner authorization for *something*—it only disputes what that something is. Google's problem is that it fails to allege owner authorization for *anything*. It just reads the authorization requirement out of the statute and out of the Complaint. That is fatal.

In any event, Google's reading is wrong. The statute and legislative history require the

---

[4] Google cites § 1201(a)(3)(*A*)'s definition of "circumvention." But how a measure is circumvented says nothing about whether § 1201(a)(3)(*B*) entitles it to protection in the first place.

copyright owner to "put in place" the control measure.[5]    While Google insists that such authorization is needed only for *users* to insert the key – not for websites to install the lock – any distinction between lock, key, and the integrated lock-and-key system is nonsense.  Accepting it would mean that Google itself would be powerless to permit *any* user to pass through SearchGuard.  So either SearchGuard is not a qualifying measure, or every person on the planet violates the DMCA when they search google.com.

Google's only response is that owner authorization is "unworkable."  G.Br. 12.  Returning to its Spotify hypothetical, it claims Spotify would need owner authorization before encrypting the signal.  But why is that so hard?  Spotify can easily add express encryption authority in its license agreements.  That may be impractical *for Google* – because it lacks privity with the countless websites it scrapes – but not for Spotify.  Regardless, "workable" or not, Congress chose to require copyright owner authorization.  Google's policy argument is, thus, beyond the ken of the Court.

*Google Does Not Allege Copyright Authority for its Non-Exclusively Licensed Content*.  Retreating, Google argues that its claim on the tiny island of non-exclusivity survives "even if the statute required copyright owner authority to authorize the deployment of SearchGuard."  G.Br. 13.  But Google does not claim *actual* or *express* SearchGuard authorization from those licensors either.  Instead, it says such authorization should be implied-in-law because they "necessarily contemplate that Google will exercise … control over how the content is accessed."  *Id*.  Silence is not authorization.  To construe it otherwise would read the "authorization" requirement out of the statute.  Google knows this, which is why it omitted the authorization requirement from the Complaint when it parroted the definition of a qualifying technological measure.  Cmplt. ¶ 28.

The DMCA is inconsistent with Google's theory.  As Google notes, "the phrase 'with the authority of the copyright owner' appears in two places in Section 1201(a)(3)," governing both

---

[5] H.R. Rep. 105-551(I), at 10 ("protections *used by copyright owners*"); at 17 ("*the copyright owner has put in place* a technological measure"); *id*. ("measure *put in place by a copyright owner*"); at 18 (same); H.R. Rep. 105-551(II), at 39 ("use of a 'key' provided *by a copyright owner*"); S. Rep. 105-190, at 10 ("obligation to provide legal protection" for measures "*used by copyright owners*"); at 28 ("*the copyright owner* has put in place a technological measure"); *id*. ("measure put *in place by the copyright owner*"); at 66 ("measures *used by copyright owners*").

"who may circumvent or gain access through the measure." G.Br. 12. But if owner authority were implied from silence, silence would authorize *both* the measure and its circumvention. Google's hypothetical proves that. It argues that, because licensors foresee that Google will employ antibot technology, they *implicitly* authorize it. But licensors equally foresee that bots will scrape public sites, so they must also implicitly authorize the alleged circumvention. Thus, the more natural reading – backed by the rule of lenity – is that silence is not enough.

Nor does any case support Google's implied-in-law theory. Google points only to *EchoStar,* a pre-*Twombly* case. But *EchoStar* did not endorse authorization by implication. It only found it "reasonable to infer," at the pleading stage, that licenses between movie studios and satellite distributors contain express IP protections and encryption obligations.[6] Inferring such *facts* under *Conley's* overruled "no set of facts" standard is a far cry from finding, as a matter of law, that every non-exclusive license to display a stock image on a public site speaks to, let alone authorizes, antibot measures. After all, "it is not … proper to assume that the [plaintiff] can prove facts that it has not alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## IV.     SEARCHGUARD IS NOT AN EFFECTIVE COPYRIGHT ACCESS CONTROL

### A.     *SearchGuard Is Not Effective Because the Content Is Available Unprotected.*

Google concedes that all the content at issue is freely available, unprotected, off google.com. Under the Sixth and Ninth Circuits' controlling decisions in *Lexmark* and *Blizzard*, that open door renders any access control "*ineffective.*"

In response, Google disclaims *responsibility* for the unlocked door. Trying to turn vice to virtue, it says it's not the copyright owner and, unlike in *Blizzard* and *Lexmark*, did not leave the content both protected and unprotected. But Google cannot transform an ineffective access control into an effective one by distancing itself from the copyright owner.

---

[6] The Court can judicially notice that licenses filed with the SEC *expressly* require encryption. *See* perma.cc/D44Q-GRNP ("Programmer acknowledges that [DirecTV] requires and applies … encryption," and "Programmer ***shall*** fully encrypt the satellite signal…."). Google does not allege any similar authorization.

Neither *Blizzard* nor *Lexmark* recognizes an exception once the door is unlocked. They did not turn on whether it was the "same party" or a different one that, in Google's words, created the unprotected "alternative path." G.Br. 17. They focused on the *copyright owner's* choice to open the door. That is true there, and it is true here. And it is fatal. The Act trains its sights on the copyrighted "*work*," asking whether "application" of a key provided "with the authority of the copyright owner" is "*require[d]* … to gain access" to it. 17 U.S.C. § 1201(a)(3)(B). If access can be had without a key, the measure is not "*required*," and so it is not "effective." *Id.*

Google may disagree with *Blizzard* and *Lexmark*, but *Blizzard* binds. Nor does Google's parade of horribles relax the constraint. Professing concerns for streamers, Google says "a movie behind Netflix's technological measures can be rented on Amazon." G.Br. 17. But that film is *always* protected—studios require *both* Amazon and Netflix to encrypt the content. Shifting hypos, Google says songs on Spotify may be broadcast over public radio airwaves. But Spotify does not need the DMCA. It has the CFAA, and artists have infringement. Going old school, Google next wonders whether *Blizzard* would strip eBook publishers of DMCA protection simply because public libraries lend hardcovers. But libraries lock their doors, use security cameras, and scan library cards. Regardless, how *Blizzard* may handle physical content when all digital forms are protected is a question for another day. Here the *digital* doors are unlocked.[7]

In response, Google says, maybe so, but the Court can't assume that at the pleading stage. But Google must *plausibly* plead the elements of its claim, including access control efficacy. The Complaint forecloses that. Google says it "locates websites or other information on the Internet …, and presents [it] as Search Results." Cmplt. ¶ 13. If Google can scrape the content from the public web, the information is clearly available unprotected. It is not always locked.

---

[7] Google's cases are inapposite. In *Disney Enters., Inc. v. VidAngel*, 869 F.3d 848 (9th Cir. 2017), studios authorized consumers to view decrypted movies on their DVD players—there was no alternative unencrypted path. In *Pearl Invs., LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326 (D. Me. 2003), the author kept a "backup" copy of his code for his own use, which had no bearing on how the measure worked "in the ordinary course." In *321 Studios v. MGM Studios, Inc.*, 307 F. Supp. 2d 1085 (N.D. Cal. 2004), the copyrighted content was *not* publicly available – only the decryption technology was – so the door was *always* locked, but the lock wasn't very good.

Google then retreats back to its tiny island of non-exclusivity. But the Complaint contains no allegations about access controls applied to licensed images when they appear on other websites. Nor does Google allege that any licensor has required all non-exclusive licensees – like Google – to deploy control measures. If the doors are always locked, then it is only by coincidence, happenstance, or magic. That does not nudge the claim across the line of plausibility.

### B.    *SearchGuard Is Not a Copyright Control Measure Because It Is Designed to Prevent Lawful Public Scraping.*

Google does not deny that it seeks to use the DMCA to protect its information monopoly over content the statute does ***not*** protect. By commingling the copyrighted with the uncopyrighted, the licensed with unlicensed, Google tries to enjoin all scraping because any given search result *might* contain a copyrighted word. That is not the law. The DMCA requires that *copyright* access controls be reasonably tailored to the protected work. SearchGuard is not so tailored.

Instead, Google argues that the DMCA imposes no tailoring requirement—if 0.000001% of Google's search results contain copyrighted content, that is enough. To get there, Google posits a strawman. It notes that "virtually every platform hosting copyrighted works also hosts unprotected material," and even DVDs might contain a few "non-copyrightable *elements*." G.Br. 18. If *perfect* tailoring were required, Google says, the DMCA would never apply. But the DMCA requires reasonable – not perfect – tailoring. For DVDs, the *entire* film is copyrighted, and encryption travels with the work through commerce. That is reasonably tailored. For social media websites that operate as a *public bulletin board*, the DMCA may not extend protection. Google's search results are like the latter.

The tailoring requirement is not just sound policy; it is grounded in the statute. A qualifying technological measure is one that "requires [a key] to gain access to the work." 17 U.S.C. § 1201(a)(3)(B). A keypad on a dentist's door protects the floss and the brush, as well as the magazines on the waiting room sofa. No one would say that is an "effective" *copyright* control. So too, antibot technologies that operate at the *domain* level, without regard to whether any particular content is copyrighted, do not qualify. A person may freely "circumvent" them because accessing the *site* to view public, non-copyrighted content is not unlawful. As far as the *DMCA* is

concerned, that person is lawfully present. If a further lockbox surrounds the copyright – for instance, a separate paywall – circumventing it might be a violation. But absent a lockbox, a person lawfully on the site may "gain access to the work" without inserting a key. And because no key is "required," domain-level antibot measures are not "effective" *copyright* controls.

Google does not grapple with this. In its view, by *sometimes* commingling protected and unprotected content, it can block access to the entire kit-and-kaboodle. But selective, post-query commingling does not strip the public of its right to search the public web. Consider a search for Google's lead counsel, which returns images from the firm's website and Pinterest, but no licensed content. The DMCA does not prevent that. Nor would an after-the-fact evaluation of what Google delivered cure the problem. Google cannot outlaw a search by appending a picture of Willie Mays to the sidebar after the query was submitted. The DMCA focuses on whether a qualifying *measure* was circumvented. The only way to fulfill the statute's purpose without impinging on the public's right of access to non-copyrighted information is to require the measure to be reasonably tailored.[8]

### C.   Bot Detection Systems Do Not "Effectively Control" Access to <u>Public</u> Websites.

SearchGuard is not an "effective" control for another reason: construing § 1201 to reach SerpApi's conduct puts the DMCA at war with the CFAA, the foundational federal statute governing unauthorized access to computer systems. They should be read in harmony.

In *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1195-96, 1201 (9th Cir. 2022), the Ninth Circuit held that "where access [to a website] is open to the general public, … a user's accessing that publicly available data will not constitute access without authorization" even where the user circumvents antibot controls. Google concedes that the conduct here is *identical* to that in *hiQ*: automated access to a public website using antibot technology. It simply wants to condemn what *hiQ* held was **authorized in law**, even if not authorized in fact.

Google says only that the DMCA is not the CFAA. True, but the differences cut against

---

[8] Far from dispensing with the tailoring requirement, Google's cases underscore it. In each, the plaintiff alleged copyright over the *entire* webpage, which no defendant challenged. The courts, therefore, did not address tailoring. *Ticketmaster, L.L.C. v. Prestige Entm't West, Inc.*, 315 F. Supp. 3d 1147 (C.D. Cal. 2018); *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096 (C.D. Cal. 2007); *Craigslist, Inc. v. Kerbel*, 2012 WL 3166798 (N.D. Cal. 2012).

Google.  The CFAA reaches all unauthorized access to a protected computer; the DMCA reaches only circumvention of measures controlling access to *copyrighted* works.  If the law authorizes *public* access to the *entire* site, it necessarily authorizes access to every component, including the copyrighted ones.  Nor can the DMCA strip that authorization away.  It does not *directly* prohibit access to anything—only "circumvention" of specified "measures."

So, Google pivots from access to circumvention.  Even if SerpApi's access to google.com is authorized, it says, its alleged "circumvention" of SearchGuard is not.  That puts the cart before the horse.  The statute only applies to a measure that "***requires*** the application of information … *with the authority of the copyright owner*, to gain access to the work."  17 U.S.C. § 1201(a)(3)(B).  Google says this is satisfied if SearchGuard "requires information to access" the content.  G.Br. 20.  But Google again glosses over *who* must provide the authority.  Where access is authorized-in-law, as it is for public websites under *hiQ*, no *separate* owner (or website operator) authorization is "*required*" to lawfully "gain access to the work."

A simple example illustrates.  A pedestrian walks along a sidewalk and encounters a gate.  If the property is private, he must pay the toll for lawful entry.  But if a public easement runs through, he may walk around the gate.  In that case, no "key" from the gatekeeper is "required" to gain lawful access to the grounds.  *hiQ* recognizes that public websites carry the digital analog of that easement: the public may access their contents without operator authorization—even by *circumventing* the site's antibot measures.  Because the public does not require a "key" to gain lawful access, antibot technologies are not access controls under the DMCA.

This reading aligns the CFAA and the DMCA; the opposite causes conflict.  The legislative history of both "frequently" invokes the same "breaking and entering analogies."[9]  Congress could not have meant that walking through the same public doorway is lawful under one statute and felonious under the other.  Construing the two statutes in harmony preserves the Internet as a public good, and keeps website operators from claiming control over information they do not own.

---

[9] *See hiQ*, 31 F.4th at 1198; H.R. Rep. 98-894, at 20 (CFAA: "analogous to that of breaking and entering"); H.R. Rep. 105-551(I), at 10 (DMCA: "equivalent of breaking into a locked room.").

## V.    SERPAPI DOES NOT "CIRCUMVENT" ANY ACCESS CONTROL

Google concedes SerpApi does not descramble, decrypt, remove, deactivate, or impair any technological measure.  Instead, it falls back on the words "avoid" or "bypass," arguing that they should be broadly construed to reach mimicry of human browsers.  But there is no difference between computer-controlled and human-controlled browsers automatically solving JavaScript challenges in the background, all without the user's involvement.  That Google *wanted* only human browsers to solve its challenges does not convert the computer-controlled solution into evasion.

Google's argument fails from the start.  It acknowledges "bypass" and "avoid" are ambiguous, but says they are not "grievously" so.  But courts do not weigh the degree of ambiguity before applying lenity—ambiguity is grievous when it determines guilt or innocence.  Rather, the rule of lenity proceeds in two steps.  Courts first try to resolve the ambiguity from the statute's "text, structure, history, and purpose," and if they cannot, they apply the narrowest reasonable read.  Google's cite to *Abramski v. U.S.*, 573 U.S. 169 (2014), is consistent: there, the statute's structure resolved the ambiguity.  Here, Google does not argue that the statute's text, structure, history, or purpose resolves whether the generic terms "bypass" or "avoid" cover human-browser mimicry.  Lenity thus requires the narrower reading, just as the Ninth Circuit found in *hiQ*, where it held the *same* mimicry was not "unauthorized access" under the CFAA.

Google next argues that "every court to consider conduct similar to SerpApi's" has found circumvention.  G.Br. 21.  But Google ignores the many cases holding the opposite.  S.Br. 21-22 (citing cases).  Instead, it cites cases relating to the creation and use of fake accounts to bypass authentication.[10]  Google requires no authentication and alleges no fake accounts.

Google also cites older cases suggesting that solving CAPTCHAs circumvents them.  Those cases do not survive *hiQ* and *Van Buren v. U.S.*, 593 U.S. 374, 392 (2021).  Google relies mainly on *Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164, 1174 (C.D. Cal. 2018), where the court held that both humans and bots were "avoiding" CAPTCHAs by solving

---

[10] *See Epic Games Inc. v. Araujo*, 2025 WL 2019810 (C.D. Cal. 2025) (fake accounts); *Philips N. Am. LLC v. Image Tech. Consulting, LLC*, 2024 WL 4876961 (N.D. Tex. 2024) (fake certificates); *RealNetworks, Inc. v. Streambox, Inc.*, 2000 WL 127311 (W.D. Wash. 2000) (same).

them, but it excused humans because they had permission under the site's terms.  That is not a natural read of the term "avoid."  It would mean *anyone* using a key – even if lawfully obtained – is "avoiding" the lock.

*Van Buren* rejected that reading, holding that password misuse is not "access in excess of authorization."    *hiQ* extended this to solving CAPTCHAs or JavaScript challenges, thus undermining *Ticketmaster's* foundation and its unnatural reading of the term "avoid."  Because the DMCA and CFAA only concern hacking-like activities, this later authority controls.  *See, e.g.*, *Healthcare Advocs., Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 642 (E.D. Pa. 2007) (DMCA only reaches "hacking"); *Project Travel, LLC v. Terra Dotta, LLC*, 2026 WL 890422, *7 (M.D. Fla. 2026) ("If the homeowner loses [its] key, or even if it is stolen, one can hardly say that the person using it, while certainly not authorized to enter, somehow 'avoided or bypassed' the door lock. They actually used the door lock in a manner intended.").

## VI.    GOOGLE FAILED TO PLAUSIBLY ALLEGE TECHNOLOGY TRAFFICKING

Google's trafficking claim fails for two additional, independent reasons: it has not alleged that (i) SerpApi traffics in circumvention tools, or that (ii) such tools are primarily designed for, and lack significant commercial value apart from, circumventing copyright access controls.

*Google Does Not Allege Trafficking in Circumvention Tools*.  Sections 1201(a)(1) and 1201(a)(2) target different things.  The former targets direct circumvention; the latter, the sale of tools to enable *others* to engage in direct circumvention.  Google alleges only that SerpApi *itself* accesses google.com and sells the resulting data to customers, not that it sells any tool enabling customers to circumvent SearchGuard themselves.  That is not a § 1201(a)(2) trafficking claim.

Google responds with word games.  It says SerpApi's opening brief used the word "technology" (as shorthand for "technology, product, or service"), and then says, of course, SerpApi offers "services."  But the sale of data is a service.  If *SerpApi* circumvents copyright controls in providing that data service, that may be a direct claim under § 1201(a)(1).  But the Complaint nowhere alleges that customers use SerpApi's services to *themselves* circumvent SearchGuard—or to do anything at all.  There is no trafficking claim.

Google then says, because SerpApi markets its data service, it must be trafficking. G.Br. 24. But to invoke the prohibition on services "marketed … *for use in circumventing*," the circumvention must still be *by the customer*. The quote Google relies on shows the opposite: SerpApi tells customers they "don't need to care about … captcha, IP address, bots detection, … or being blocked by Google." G.Br. 5 (citing Cmplt. ¶ 34). But that describes SerpApi's own scraping prowess. It is a pitch for outsourcing data collection, not for the sale of circumvention services. A lawncare service that promises homeowners "we can mow your lawn faster, better, and cheaper because we have better equipment" is not trafficking in mowers.

*Google Does Not Allege SerpApi's Primary Purpose is to Circumvent <u>Copyright Controls</u>.* Google concedes that most of the information on google.com is not copyrighted, much less owned by Google. Because customers are entitled to use SerpApi to obtain that non-copyrighted information, its tools have legitimate and commercially significant uses "other than to circumvent a technological measure that effectively controls access to a [copyrighted] work." 17 U.S.C. § 1201(a)(2)(B).

Google ignores the statutory text, saying it is *irrelevant* "whether the content obtained through circumvention [is] non-copyrighted." G.Br. 24. But § 1201(a)(2)(B) only reaches tools with no "commercially significant purpose or use *other than* to circumvent a technological measure that effectively controls access to a [copyrighted] *work*." Because Google uses SearchGuard to gate non-copyrighted content, there is no prohibition on selling tools that circumvent the measure when Google deploys it for that unprotected purpose.

This principle is unremarkable. Technologies often have both lawful and unlawful uses. A VCR, for example, can lawfully record television programs for home viewing, even though it can also be used for infringing purposes. That does not make the VCR illegal. So too, even if SerpApi's tools could be put to improper use, the wealth of permissible uses precludes liability.

## VII.    GOOGLE FAILS TO ALLEGE COGNIZABLE DMCA INJURY

Article III requires a concrete injury—Google alleges none. It does not claim injury as a copyright owner or exclusive licensee, because it is neither. The omission glares. Its own cases –

*Disney* and *Columbia Pictures* – involved claims by copyright owners possessing the right of exclusion.[11]  Google concedes it has no such right.  Turning to sophistry, it says its "investment" in non-exclusive licenses has been "undermine[d]."  G.Br. 10.  But Google does not allege that it paid more for them, or that it was deprived of the ability to use or display the images.  Put simply, Google got exactly what it paid for.  That is no Article III injury.

Google next asserts that SerpApi "disrupts [its] relationships with rights holders who look to Google to prevent misappropriation of [their] content."  G.Br. 10.  But Google identifies no agreement with any copyright owner imposing such obligations, and it elsewhere insists that obtaining owner authorization is "unworkable."  With no impairment, Google points to Reddit's lawsuit against SerpApi.  But Google alleges no facts about its Reddit relationship or how SerpApi affected it.  Nor does Google have standing just because Reddit – a third party, also with no copyrights – sued SerpApi.  There is no Article III bootstrap.

Finally, Google claims injury as a technology provider—but a website operator's operational costs are not "injuries."  Aside from the fact that these expenses are irrelevant if the DMCA only protects copyright interests, no causal injury has been plausibly alleged.  Google does not dispute that the cost of running its site or developing SearchGuard would be identical even if its search results contained no copyrighted content—or even if SerpApi did not exist.  Google only alleges that *SerpApi* modified *its own* behavior *after* Google developed SearchGuard.  Cmplt. ¶ 33.  That is a cost to SerpApi, not Google.  Google's only *alleged* expense is the cost of responding to the public's queries, including SerpApi's.  But server costs do not become "injuries" just because some results include a licensed image.  Article III requires more than a conclusory assertion that every electron touching a Google server is an "injury."

## VIII.   CONCLUSION

The Complaint must be dismissed.

---

[11] *See* G.Br. 10 (*citing Disney*, 869 F.3d at 866; *Columbia Pictures Indus., Inc. v. Galindo*, 2020 WL 3124347 (C.D. Cal. 2020)).

Dated: May 6, 2026

Respectfully submitted,

*/s/  Joseph E. Clark*
Joseph E. Clark (SBN 281021)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
jclark@proskauer.com

Colin R. Kass (*pro hac vice pending*)
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 416-6890
ckass@proskauer.com

David A. Munkittrick (*pro hac vice pending*)
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
dmunkittrick@proskauer.com

Heather Tovar (SBN 237004)
AD ASTRA LAW GROUP, P.C.
582 Market Street, 17th Floor
San Francisco, CA 94104
(415) 795-3579
htovar@astralegal.com

*Attorneys for Defendant SerpApi, LLC*